IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WEYERHAEUSER COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No._____ |
| v. | ) | |
| | ) | |
| DOW CHEMICAL COMPANY, UNIVERSITY | ) | |
| OF LEEDS, BTG INTERNATIONAL LTD., and | ) | |
| IAN M. WARD, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Weyerhaeuser Company, for its complaint against Defendants Dow Chemical Company, University of Leeds, BTG International Limited and Ian M. Ward, PhD, alleges as follows:

### PARTIES

1.     Plaintiff Weyerhaeuser Company ("Weyerhaeuser") is a Washington corporation with its principal place of business in Federal Way, Washington.  Weyerhaeuser is an international forest products company, which designs, develops, manufactures and sells a variety of innovation forest products.

2.     Weyerhaeuser is informed and believes, and on that basis alleges, that Dow Chemical Company ("Dow") is a Delaware corporation with its principal place of business in Midland, Michigan.  Weyerhaeuser is further informed and believes that Dow provides chemical, plastic, and agricultural products and services.

3.     Weyerhaeuser is informed and believes, and on that basis alleges, that University of Leeds is a teaching and research university located in Leeds, West Yorkshire, England.

4.     Weyerhaeuser is informed and believes, and on that basis alleges, that BTG International Limited ("BTG") is an English public limited company with its principal place of

business in London, England. Weyerhaeuser is further informed and believes, and on that basis alleges, that BTG was, at all times relevant herein, the intellectual property licensing agent, representative, or body of University of Leeds.

5.    Weyerhaeuser is informed and believes, and on that basis alleges, that Ian M. Ward, PhD, ("Ward") is and was, at all times relevant herein, an Emeritus Professor with University of Leeds, and a resident of West Yorkshire, England.

6.    Dow, University of Leeds, BTG, Ian M. Ward, and are referred to collectively herein, where appropriate, as "Defendants."

7.    Weyerhaeuser is informed and believes, and on that basis alleges, that at all relevant times, Defendants were acting on their own behalf and/or as the parents, subsidiaries, agents, representatives, and/or licensees of each other, or that as yet undetermined corporate or contractual relationships existed between or among Defendants, such that the acts described herein were done in the course and scope of such relationships, as well as on each Defendant's own behalf.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of this action pursuant to at least the following statutes:  28 U.S.C. §§ 2201, 2202 (declaratory relief); 35 U.S.C. § 256 (inventorship); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity of parties; the pecuniary value of the intellectual property rights that Weyerhaeuser seeks to enforce and/or protect exceeds $75,000); and 28 U.S.C. § 1338(a) (action arising under an Act of Congress relating to patents).

9.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Dow is a resident of this district, and because a substantial part of the events giving rise to Weyerhaeuser's causes of action arose by and through Dow's activities as a resident of this district.

2

## GENERAL ALLEGATIONS

10.    This action arises from Defendants' challenges to the inventorship and ownership of certain intellectual property assets owned by Weyerhaeuser. These challenges to Weyerhaeuser's intellectual property rights, while lacking merit or factual support, have created an actual and justiciable controversy among the parties regarding the inventorship and ownership of certain patented technology owned by Weyerhaeuser. Therefore, Weyerhaeuser, by this action, seeks a judicial declaration to quiet the title of the intellectual property assets at issue, and to specifically clear the cloud to that title, right, and interest that Defendants have purposefully created over those assets.

The Patented Technology

11.    On or about September 6, 2005, U.S. Patent No. 6,939,496 B2 ("the '496 Patent"), entitled "Method and Apparatus for Forming Composite Material and Composite Material Therefrom," issued to the two named and actual inventors of this new and novel invention:  Francis W. Maine, PhD, and William R. Newson (where appropriate, Maine and Newson are referred to as the "Inventors"). A true and correct copy of the '496 Patent is attached as Exhibit A. The '496 Patent is generally directed to the field of "oriented plastics," and more particularly to a method for producing a composite material consisting of a polymer with a cellulose particulate filler, such as wood. The resulting composite material, which is dramatically less dense and heavy than previously-existing composites, is commonly known as a "wood fiber plastic composite," or "WPC." WPC material has a similar look, feel, and performance to wood, and can be substituted for wood in many applications, including, but not limited to, decking, siding, and trim.

12.    The '496 Patent describes and claims a new and novel process for generating and producing composite materials like WPC. Prior to the '496 Patent, the traditional process for creating composite material was through an existing process known as "ram extrusion." Ram extrusion utilizes a chamber in which polymer billets containing cellulose particulate filler are placed. One end of the chamber contains a die, and the other end of the chamber includes a

3

mobile "ram." The billet is placed in the chamber, and the mobile ram pushes the billet and forces it through the die. The resultant polymer is "oriented" in a longitudinal direction and, as a result, has increased strength and stiffness.

13.    The novel process described in the '496 Patent combines a die-drawing process with ram extrusion. In the die-drawing process, the billet is initially pushed through the extruder, and is then clamped onto and pulled through the die. The properties of the oriented end-product of the die-drawing process are significantly different from those provided by traditional ram extrusion. In particular, the die-drawn material has a lower density than the starting billet, in large part because the die-drawing of the billet lowers the density as the particulate filler and the plastic do not adhere to each other, but rather pull apart resulting in voids and a lower density material. In addition, the die-drawn material is comparable in strength and flexibility to ram-extruded WPC and wood, but has the advantage of having a lower density.

14.    Prior art processes "taught away" from the invention of the '496 Patent because, among other reasons, such prior art was directed to avoiding the creation of voids while the invention of the '496 Patent intentionally created voids.

15.    Two patent applications that are related to the '496 Patent and describe similar technology are still pending before the U.S. Patent and Trademark Office ("USPTO"). The first application, serial number 11/065,787 ("the '787 Application"), is a divisional of the '496 Patent. A true and correct copy of the '797 Application is attached as Exhibit B. The second application, serial number 11/046,628 ("the '628 Application"), is a continuation-in-part of the '496 Patent. A true and correct copy of the '628 Application is attached as Exhibit C. Both applications properly name Francis W. Maine, PhD, and William R. Newson as inventors. The '496 Patent, the '787 Application, and the '628 Application all claim priority to a provisional application filed with the USPTO on December 20, 1999.

<u>Weyerhaeuser Purchases the Patented Technology</u>

16.    The '496 Patent and related applications were originally assigned to PSA Composites, LLC, which is a company affiliated with the Inventors. On October 3, 2006,

Weyerhaeuser and PSA Composites, LLC entered into an "Asset Purchase Agreement," whereby Weyerhaeuser obtained for valuable consideration, among other assets, all right, title, and interest in the '496 Patent, the '787 Application, the '628 Application, and all related foreign patents and patent applications ("the Intellectual Property"). Weyerhaeuser purchased the Intellectual Property with plans to commercialize the patented technology in the near future.

17.    As such, any challenge to the inventorship of the '496 Patent or the Intellectual Property, or any cloud on title, ownership, or inventorship, presents the potential of significant commercial and/or economic damage to Weyerhaeuser.

<u>Defendants Challenge the Inventorship and Ownership of the Patented Technology</u>

18.    On or around January, 2007, Dow first contacted Weyerhaeuser, asserting that Dow possesses certain rights to the '496 Patent and the Intellectual Property. Dow based its claims on a purported assignment from Ward to Dow of Ward's alleged rights as "co-inventor."

19.    Weyerhaeuser is informed and believes, and on that basis alleges, that Dow bases its allegations on work that University of Leeds and Dr. Ward allegedly had performed with named inventors Dr. Maine and Mr. Newson, when in reality neither Ward nor the University of Leeds contributed at all to the discovery and/or conception of the claimed inventions of the Intellectual Property. As described in more detail below, Weyerhaeuser vigorously disputes Dow's contentions that any employee of the University of Leeds, including Ward, contributed to the conception of any aspect of the patented inventions.

20.    Weyerhaeuser engaged in subsequent discussions with Dow regarding the issue of inventorship and ownership of the Intellectual Property, but the parties were not able to reach a resolution. As part of those discussions, Weyerhaeuser asked Dow to identify exactly what aspect or aspects of the patented technology Ward and/or the University of Leeds allegedly contributed to, and further asked Dow to provide documentation to support Defendants' claim of incorrect inventorship. Dow did not meaningfully respond and identify the contributions of either Ward or the University of Leeds.

21.     On March 23, 2007, Dow sent a further letter to Weyerhaeuser reiterating its position regarding the status of the patent and patent applications, asserting that:

> "(1) inventorship presently identified in these Patents is incorrect;
> (2) personnel from the University of Leeds participated in the conception and reduction to practice of the claimed inventions;
> (3) Ownership rights to any such inventions of personnel vested with Leeds;
> (4) There was no other applicable legal obligation that changed and/or transferred the ownership rights away from Leeds; and
> (5) Leeds has subsequently assigned all such rights in the Patents to Dow."

22.     Dow further stated in its March 23, 2007 letter that "we believe we have the freedom to exploit all of the technology which we acquired from Leeds as well as all of the technology which we have developed in this area.  In particular, it is our position that the Patents cannot be used to interfere with our exploitation of the technology."  To date, however, Dow apparently has not formally commercialized any product utilizing the '496 Patent or the Intellectual Property.  To do so, Dow would be in violation of and infringing upon the intellectual property rights owned by Weyerhaeuser.

23.     In addition to the claims Dow has made to Weyerhaeuser, Weyerhaeuser is informed and believes, and on that basis alleges, that an attorney from the University of Leeds contacted Dr. Maine on or around January, 2007, informing him that the University of Leeds believed that there were issues regarding the inventorship of the '496 Patent and related patents and applications, and that Dr. Ward should have been named as a co-inventor of those patents and applications.

24.     Dow's March 23, 2007 letter to Weyerhaeuser, the parties' related discussions, and the University of Leeds' contact with Dr. Maine all demonstrate that an actual and justiciable controversy exists among the parties in this case regarding the inventorship and ownership of the patented technology.  Defendants' actions have also created in Weyerhaeuser a reasonable apprehension that Defendants will file suit to "correct" inventorship of the '496 Patent, the '787 Application, and the '628 Application under 35 U.S.C. §§ 256, 116, and/or will file suit to

invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors.

25.    Indeed, Weyerhaeuser is informed and believes, and on that basis alleges, that the impetus behind Defendants' challenges to the '496 Patent and related applications is Dow's plan to commercialize and exploit that patented technology, in violation of intellectual property rights that Weyerhaeuser rightfully owns. Therefore, it is vital that Weyerhaeuser promptly clear the cloud that Defendants have created over these intellectual property assets, through a determination that Maine and Newson are the true and only co-inventors of the Intellectual Property.

The Inventors' Relationship With University of Leeds and Dr. Ward

26.    The first named inventor of the patented technology, Francis W. Maine, PhD, holds a doctorate in an organic/polymer chemistry from Cambridge University, with undergraduate and graduate degrees from Queen's University in Ontario, Canada. He has, throughout his career, worked in the field of "orientated plastics," and has focused on the commercialization of such oriented plastics. In connection with those efforts, Dr. Maine initially founded a company called Tech-Triangle Plastic Wire Inc. ("Tech Triangle"). The second named inventor of the patented technology, Willam R. Newson, began working with Dr. Maine while Mr. Newson was a graduate student at Queen's University, studying materials and metallurgical engineering.

27.    On or around 1997, Tech-Triangle became involved in a commercial project to make musical drumsticks from oriented plastics or WPC. The goal was to make a synthetic drumstick that would look and perform like wood but would be much less expensive to manufacture. While the drumstick project was a commercial success, it had limited profitability. Therefore, Tech-Triangle also began looking for alternative markets for WPC.

28.    Tech-Triangle was aware of the "die-drawing" process for manufacturing oriented plastics, initially developed by Ward. Therefore, in or around 1997, Tech-Triangle approached Dr. Ward to discuss possible use of his die-drawing process. On or around October 2, 1997,

Tech-Triangle and BTG, which Weyerhaeuser is informed and believes was at that time the intellectual property licensing body of University of Leeds, entered into a "Confidentially Undertaking" agreement to facilitate the parties' discussions regarding the die-drawing process.

29.     Weyerhaeuser is informed and believes, and on that basis alleges, that Dr. Ward is a named inventor on several U.S. Patents, and has, throughout his career, engaged in research and commercial activities with U.S. companies and institutions in the U.S. and abroad.

30.     The parties followed up that confidentiality agreement with a "License Agreement," executed on or around September 30, 1998, granting Tech-Triangle a license under several of Dr. Ward's die-drawing patents.  A true and correct copy of the September 30, 1998 License Agreement is attached hereto as Exhibit D.  The License Agreement included a royalty provision and a provision requiring Tech-Triangle to pay BTG a minimum annual payment of $8,000 (in Canadian dollars).  The License Agreement also included a grant-back provision for "Licensee Improvements," whereby BTG would receive a worldwide, non-exclusive license with a right to sublicense to any technology that Tech-Triangle may develop as an improvement to the licensed technology.  The License Agreement broadly defined "Licensee Improvements" as "any improvement to or new application of the Licensed Technology devised by or accruing to the Licensee." (*See* Exhibit D, Paragraph 1.)

31.     A number of the licensed patents under the License Agreement had expiration dates less than two years from the date the parties signed the License Agreement.  Moreover, Weyerhaeuser is informed and believes that Tech-Triangle never actually used the non-patented technology covered by the License Agreement in any of its commercial endeavors or design and development activity.

32.     In addition to the License Agreement, on or around May, 1998, Tech-Triangle entered into an agreement with Dr. Ward and University of Leeds to perform two separate and distinct projects for Tech-Triangle.  With those projects, Tech-Triangle was attempting to collect die-drawing parameter data that would generally further speed up its manufacturing process for the manufacture of musical drumsticks.

33.    The first project involved establishing specific optimum die-drawing conditions for producing a one-half inch diameter polypropylene rod at a rapid rate for drumsticks. That project involved a standard pure polypropylene rod, and did not involve any wood fiber plastic composites. The second project involved establishing design criteria, including time and temperature parameters, for the continuous die-drawing of a pure polypropylene rod. That project also used a standard pure polypropylene rod, and did not involve wood fiber plastic composites. Ward reported the results of those two projects to Tech-Triangle on or around late 1998, and he was compensated for that work pursuant to the specified proposal. However, none of this work was relied upon by the Inventors for their invention as embodied in the Intellectual Property.

Conception of the Patented Technology

34.    In time frame of late 1998 to early 1999, Dr. Maine and Mr. Newson continued their independent efforts to develop a more efficient process for extruding wood fiber plastic composite (or "WPC") that would combine both ram extrusion and die-drawing. By that time, they had independently designed, developed, and built an extruding machine called "WREN-1" that was capable of both ram extrusion and die-drawing.

35.    On or about December 20, 1999, Dr. Maine and Mr. Newson filed a U.S. provisional patent application with the USPTO regarding the processes they had developed for extruding WPC, to that point in time.

36.    Weyerhaeuser is informed and believes, and on that basis alleges, that in the early Spring, and before April 30, 2000, Dr. Maine and Mr. Newson made an important and unexpected discovery regarding the novel effect that their manufacturing process (combining ram extrusion and die-drawing) for WPC was having on the properties of the resultant WPC product. When certain parameters were used, these parameters were independently designed and conceived of by Inventors without any input, effort, or advice from Defendants. As explained above, and as set forth in the '496 Patent, Dr. Maine and Mr. Newson discovered that the WPC material from their manufacturing process had a lower density than the starting billet and from

material manufactured from traditional "prior art" manufacturing processes. In addition, Dr. Maine and Mr. Newson discovered that despite the lower density, the die-drawn material was comparable in strength and flexibility to traditional ram-extruded WPC and wood.

37.     On December 19, 2000, Dr. Maine and Mr. Newson filed an international patent application under the Patent Cooperation Treaty (PCT) describing their discovery. That application subsequently entered prosecution before the USPTO and resulted in the '496 Patent and related U.S. patent applications.

38.     Weyerhaeuser is informed and believes, and on that basis alleges, that neither Dr. Ward nor any other employee of University of Leeds contributed to the conception of the invention claimed by the '496 Patent and related applications – it was only Dr. Maine and Mr. Newson that discovered and appreciated that the die-drawn WPC has a lower density, and this was a new, novel, and non-obvious invention.

Dr. Maine Sends Letters and Papers to Dr. Ward Describing the Patented Technology, With No Claim of Inventorship by Ward

39.     On or around March 13, 2002, Dr. Maine sent a letter to Dr. Ward, enclosing a copy of a paper written by Dr. Maine and Mr. Newson entitled *Second Generation Woodfibre-Polymer Composites*, which was presented at the May 23-24, 2002 Progress in Woodfibre-Plastic Composites-2002 Conference. In that paper, Dr. Maine and Mr. Newson explained that they discovered a new process for obtaining a lower-density WPC though die-drawing, which is the very invention that they described and claimed in the patent application that would later become the '496 Patent. The paper was sent to Ward as a colleague in this scientific field and to apprise him and others of the work being done by Dr. Maine and Mr. Newson. Since Ward had not contributed at all to the discovery of this invention, no credit was due to him or given. Weyerhaeuser is informed and believes, and on that basis alleges, that neither Dr. Ward nor University of Leeds responded, in any fashion, to Dr. Maine's March 13, 2002 letter or the enclosed paper, claiming any rights in the invention based on Dr. Ward being a "co-inventor."

40.     On or around July 31, 2004, Dr. Maine sent another letter to Dr. Ward, again enclosing Dr. Maine and Mr. Newson's May, 2002 paper *Second Generation Woodfibre-Polymer Composites*. Dr. Maine also included with that letter three other papers describing the now-patented technology: *New Developments in Woodfibre-Polymer Composites*, dated December, 2001; *Second Generation Woodfibre-Polymer Composites and Calcium Carbonate Composites*, dated April, 2003; and *Advances in New WPC Technologies*, dated May, 2004. Again, Weyerhaeuser is informed and believes, and based thereon alleges, that neither Dr. Ward nor University of Leeds responded at all to Dr. Maine's July 31, 2004 letter or the enclosed papers, which did not attribute the patented technology to Dr. Ward, claiming any rights in the invention based upon Dr. Ward being a "co-inventor."

41.     In addition, on or around December 2004, Dr. Maine sent to Dr. Ward a copy of a "Christmas Letter" that Dr. Maine sent to his family, friends, and business associates. In that letter, Dr. Maine explained that Canadian and European patents were granted on "our oriented low density woodfibre/plastic composites which we are in the process of commercializing." Dr. Maine sent a similar "Christmas Letter" to Dr. Ward on or around December, 2005, in which Dr. Maine states that, in addition to the Canadian and European patents that issued in 2004, "the first U.S. patent issued on September 6, 2005. This is U.S. Patent No. 6,939,496 …. This patent is on our oriented low density woodfibre/plastic composites which we are in the process of commercializing." Weyerhaeuser is informed and believes, and based thereon alleges, that just as with the other correspondence Dr. Maine sent to Dr. Ward regarding the patented technology, neither Dr. Ward nor University of Leeds provided any response to the two Christmas Letters, claiming any rights in these patents, which are the very patents at issue based on a claim that Dr. Ward was a "co-inventor."

42.     Weyerhaeuser is informed and believes, and based thereon alleges, that at no point prior to January, 2007 did Dr. Ward or the University of Leeds, or any other Defendant, ever claim or communicate to Dr. Maine, Mr. Newson, or Weyerhaeuser that Dr. Ward, or anyone else, should have been named as a contributor to the patented invention, despite being on

11

notice as early as March 13, 2002 that Dr. Maine and Mr. Newson were publishing articles describing the patented technology, and despite being on notice as early as December, 2004 that they were seeking and obtaining patents all over the world on their technology.

43.    Defendants' failure to assert Dr. Ward's purported rights in the patented technology until January, 2007 – only after Weyerhaeuser purchased the '496 Patent and related applications – caused Weyerhaeuser, and, on information and belief, Dr. Maine and Mr. Newson, to reasonably infer that there were no issues with the inventorship of the patented technology, and certainly caused them to infer that Dr. Ward would make no such assertion.

44.    Weyerhaeuser relied on Defendant's silence when it purchased from PSA Composites, LLC the '496 Patent, the '787 Application, the '628 Application, and related foreign patents and patent applications.

45.    Because of that reliance, Weyerhaeuser will be materially prejudiced if Defendants are allowed to seek to "correct" the inventorship of the '496 Patent, the '787 Application, and the '628 Application, or seeks to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors.  Defendants should be equitably estopped from such action.

<u>Defendants Waived All Purported Rights to the Patented Technology Under Termination and Satisfaction Agreements</u>

46.    Weyerhaeuser is informed and believes, and on that basis alleges, that some time after September 30, 1998, the successor company to Tech-Triangle, SHW Technologies, Inc., became concerned that it was still paying to BTG the minimum annual payment of $8,000 required by the License Agreement, yet it was not using, and had not been using, the licensed technology, and several of the licensed patents had, in fact, expired.

47.    As a result, SHW Technologies, Inc., along with its affiliated companies, PSA Composites, Inc. and PSA International, Inc., entered into a "Termination Agreement" with BTG, which Weyerhaeuser is informed and believes was executed on or around March 1, 2004. A true and correct copy of the Termination Agreement is attached hereto as Exhibit E.

48.    Pursuant to the Termination Agreement, PSA Composites, Inc. ("PSAC") paid to BTG the sum of UK £150,000 to terminate the September 30, 1998 License Agreement (referred to in the Termination Agreement as the "DD License"). In addition, Paragraph 5.1 of the Termination Agreement expressly provides that upon receipt of the UK £150,000 from PSAC:

> "the DD License shall terminate and all of the provisions shall thereafter be declared to be null and void and of no further force and effect …. BTG shall upon receipt of such sums forever waive its rights to any non-exclusive license of rights to any intellectual property of SHW, PSAC and/or any of their affiliates that exists as of the date of this Agreement and also forever waives its (or others) right to be granted any license whosoever to the Licensee Improvements (as that term is defined within the DD License) or related know how as provided for in Clause 14 of the DD License."

49.    The Termination Agreement also provides, in Paragraph 7.1, the following General Release:

> "each of the parties hereto hereby release and forever discharge each other and their respective officers, directors, agents, employees, shareholders, partners, affiliates, related companies, associates, successors and assigns (current, future and former) … from any and all action, causes of action, claims and demands whosoever, any party ever had, now have or may hereinafter have, arising in any way whatsoever out of, or related to, the DD License and/or the grant of licenses thereunder, save and except only for obligations pursuant to this Agreement."

50.    Lastly, the Termination Agreement states in Paragraph 12 that "This Agreement represents the entire agreement between the parties in relation to the subject matter contained in this Agreement and supersedes all other agreements and representations made by either party, whether oral or written …."

51.    Subsequently, SHW Technologies, Inc., PSA Composites, Inc., PSA International, Inc., and BTG executed on or around March, 2005, a "Satisfaction of Licensing Obligations and Release of Guarantors." A true and correct copy of that Agreement is attached as Exhibit F. That agreement acknowledges receipt of all monies due under the Termination Agreement and repeats the releases set forth in the Termination Agreement.

52.    Weyerhaeuser is informed and believes, and on that basis alleges, that while the Intellectual Property was a new, novel, and non-obvious invention solely conceived by Dr. Maine and Mr. Newson, without any input, assistance, or advice from the Defendants, the Intellectual Property was a "Licensee Improvement" as that term is broadly defined in the September 30, 1998 License Agreement.  Therefore, under the Termination and Satisfaction Agreements, Defendants have waived all right, title, and/or interest in the Intellectual Property and have released any and all related claims to that technology.

53.    Moreover, Weyerhaeuser is informed and believes, and on that basis alleges, that PSAC paid UK £150,000 to BTG to terminate the License Agreement specifically to preclude any claim by BTG that it is entitled to a grant-back of the Intellectual Property because it is a "Licensee Improvement."

54.    Wherefore, Weyerhaeuser files this action seeking declarations under the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201 and 2202: (1) that Francis W. Maine, PhD, and William R. Newson are the correct and only inventors of the claimed inventions of the '496 Patent, the '787 Application, and the '628 Application, and that Weyerhaeuser properly holds all rights, title, and interest in the '496 Patent, the '787 Application, and the '628 Application; (2) that Defendants, and each of them, have released and waived any and all right, title, and/or interest, in any form, in the '496 Patent, the '787 Application, and the '628 Application, and that Defendants, and each of them, have released and waived any and all related claims to the '496 Patent, the '787 Application, and the '628 Application; and (3) that Defendants, and each of them, are equitably estopped from seeking to "correct" the inventorship of the '496 Patent, the '787 Application, and the '628 Application, from seeking to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors, and from asserting any ownership interest in those intellectual property assets.

## FIRST CAUSE OF ACTION

### (Declaratory Relief Regarding Inventorship)

55.     Weyerhaeuser realleges and incorporates by reference paragraphs 1 through 54 above as though fully set forth herein.

56.     Defendants, by and through their actions, including, but not limited to, Dow's March 23, 2007 letter to Weyerhaeuser, the parties' related discussions, and the University of Leeds' contact with Dr. Maine, have created an actual controversy among the parties regarding inventorship and/or ownership of the '496 Patent, the '787 Application, and the '628 Application. Moreover, Defendants' actions have created a reasonable apprehension that Defendants, or any of them, will file suit to "correct" inventorship of the '496 Patent, the '787 Application, and the '628 Application, and/or will file suit to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors.

57.     Pursuant to 28 U.S.C. Sections 2201 and 2202, this Court may declare the rights and other legal relationships of the parties, may quiet the title of the intellectual property assets at issue, and may order such other and further relief as may be necessary.

58.     Weyerhaeuser is informed and believes, and on that basis alleges, that Francis W. Maine, PhD, and William R. Newson are the correct and only inventors of claimed inventions of the '496 Patent, the '787 Application, and the '628 Application. Therefore, Weyerhaeuser properly holds all rights, title, and interest in the claimed inventions of the '496 Patent, the '787 Application, and the '628 Application.

59.     Weyerhaeuser is further informed and believes, and on that basis alleges, that the '496 Patent, the '787 Application, and the '628 Application are not invalid for failing to name the correct inventors.

60.     Absent a judicial declaration regarding the inventorship of the '496 Patent, the '787 Application, and the '628 Application, as well as a determination of the parties' rights, if any, with respect to those intellectual property rights, a multiplicity of actions would result.

61.     Weyerhaeuser therefore requests a judicial determination that Francis W. Maine, PhD, and William R. Newson are the correct and only inventors of claimed inventions of the '496 Patent, the '787 Application, and the '628 Application, and that Weyerhaeuser properly

holds all rights, title, and interest in the '496 Patent, the '787 Application, and the '628 Application.

## SECOND CAUSE OF ACTION

### (Declaratory Relief Under the Termination and Satisfaction Agreements)

62.    Weyerhaeuser realleges and incorporates by reference paragraphs 1 through 61 above as though fully set forth herein.

63.    Defendants, by and through their actions, including, but not limited to, Dow's March 23, 2007 letter to Weyerhaeuser, the parties' related discussions, and the University of Leeds' contact with Dr. Maine, have created an actual controversy among the parties regarding inventorship and/or ownership of the '496 Patent, the '787 Application, and the '628 Application.  Moreover, Defendants' actions have created a reasonable apprehension that Defendants, or any of them, will file suit to "correct" inventorship of the '496 Patent, the '787 Application, and the '628 Application, and/or will file suit to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors.

64.    Pursuant to 28 U.S.C. Sections 2201 and 2202, this Court may declare the rights and other legal relationships of the parties, may quiet the title of the intellectual property assets at issue, and may order such other and further relief as may be necessary.

65.    Pursuant to each of the "Termination Agreement" and "Satisfaction of Licensing Obligations and Release of Guarantors," Defendants have waived all right, title, and/or interest in the '496 Patent, the '787 Application, and the '628 Application, and have released any and all related claims to the '496 Patent, the '787 Application, and the '628 Application.

66.    Accordingly, Weyerhaeuser requests a judicial determination that Defendants, and each of them, have released and waived any and all right, title, and/or interest, in any form, in the '496 Patent, the '787 Application, and the '628 Application, and that Defendants, and each of them, have released and waived any and all related claims to the '496 Patent, the '787 Application, and the '628 Application.

### THIRD CAUSE OF ACTION

### (Declaratory Relief – Equitable Estoppel)

67.     Weyerhaeuser realleges and incorporates by reference paragraphs 1 through 66 above as though fully set forth herein.

68.     Defendants, by and through their actions, including, but not limited to, Dow's March 23, 2007 letter to Weyerhaeuser, the parties' related discussions, and the University of Leeds' contact with Dr. Maine, have created an actual controversy among the parties regarding inventorship and/or ownership of the '496 Patent, the '787 Application, and the '628 Application.  Moreover, Defendants' actions have created a reasonable apprehension that Defendants, or any of them, will file suit to "correct" inventorship of the '496 Patent, the '787 Application, and the '628 Application, and/or will file suit to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors.

69.     Pursuant to 28 U.S.C. Sections 2201 and 2202, this Court may declare the rights and other legal relationships of the parties, may quiet the title of the intellectual property assets at issue, and may order such other and further relief as may be necessary.

70.     Defendants were on notice as early as March 13, 2002 that Dr. Maine and Mr. Newson were publishing articles describing the patented technology, and Defendants were further on notice as early as December, 2004 that Dr. Maine and Mr. Newson were seeking and obtaining patents all over the world on their technology.

71.     Weyerhaeuser is informed and believes, and on that basis alleges, that at no time prior to January, 2007 did Dr. Ward, the University of Leeds, or any other Defendant ever communicate to Dr. Maine, Mr. Newson, or Weyerhaeuser that Dr. Ward should have been named as a contributor to the patented invention.

72.     Defendants' failure to assert Dr. Ward's purported rights in the patented technology until January, 2007 caused Weyerhaeuser, and, on information and belief, Dr. Maine and Mr. Newson, to reasonably infer that there were no issues with the inventorship of the

patented technology, and caused Weyerhaeuser to infer that Defendants would not challenge the inventorship of the patented technology.

73.    Weyerhaeuser relied on Defendants' silence when it purchased from PSA Composites, LLC the '496 Patent, the '787 Application, the '628 Application, and related foreign patents and patent applications.

74.    Because of that reliance, Weyerhaeuser will be materially prejudiced if Defendants are allowed to seek to "correct" the inventorship of the '496 Patent, the '787 Application, and the '628 Application, or seek to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors.

75.    Weyerhaeuser thus requests a judicial determination that Defendants, and each of them, are equitably estopped from seeking to "correct" the inventorship of the '496 Patent, the '787 Application, and the '628 Application, from seeking to invalidate the '496 Patent, the '787 Application, and the '628 Application for failing to name the correct inventors, and from asserting any ownership interest in those intellectual property assets.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Weyerhaeuser hereby demands a trial by jury on any and all issues triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, Weyerhaeuser prays for relief against Defendants as follows:

(a)    for a Judgment declaring that Francis W. Maine, PhD, and William R. Newson are the correct and only inventors of the claimed inventions of the '496 Patent, the '787 Application, and the '628 Application;

(b)    for a Judgment that Weyerhaeuser properly holds all rights, title, and interest in the '496 Patent, the '787 Application, and the '628 Application;

(c)     for a Judgment declaring that Defendants, and each of them, have released and

waived any and all right, title, and/or interest, in any form, in the '496 Patent, the

'787 Application, and the '628 Application, and that Defendants, and each of

them, have released and waived any and all related claims to the '496 Patent, the

'787 Application, and the '628 Application;

(d)     for a Judgment declaring that Defendants, and each of them, are equitably

estopped from seeking to "correct" the inventorship of the '496 Patent, the '787

Application, and the '628 Application, from seeking to invalidate the '496 Patent,

the '787 Application, and the '628 Application for failing to name the correct

inventors, and from asserting any ownership interest in those intellectual property

assets;

(e)     for an award against Defendants in favor of Weyerhaeuser for the full costs of this

action, including, but not limited to, reasonable attorneys' fees and costs; and

(f)     for such other relief as the Court may deem just and proper.


ASHBY & GEDDES


Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Lauren E. Maguire (I.D. #4261)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899-1150
(302) 654-1888

*Attorneys for Plaintiff*

*Of Counsel:*

Kenneth E. Keller
KRIEG, KELLER, SLOAN,
   REILLEY & ROMAN LLP
114 Sansome Street, 4th Floor
San Francisco, CA 94104
Telephone: (415) 249-8330
Facsimile: (415) 249-8333

Dated: June 21, 2007
181678.1

# EXHIBIT A

US006939496B2

(12) **United States Patent**
Maine et al.

(10) Patent No.: **US 6,939,496 B2**
(45) Date of Patent: **Sep. 6, 2005**

(54) **METHOD AND APPARATUS FOR FORMING COMPOSITE MATERIAL AND COMPOSITE MATERIAL THEREFROM**

(75) Inventors: **Francis William Maine**, Ontario (CA); **William Roy Newson**, Ontario (CA)

(73) Assignee: **PSA Composites, LLC**, Renton, WA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/168,716**

(22) PCT Filed: **Dec. 19, 2000**

(86) PCT No.: **PCT/CA00/01555**

§ 371 (c)(1),
(2), (4) Date: **Oct. 28, 2002**

(87) PCT Pub. No.: **WO01/45915**

PCT Pub. Date: **Jun. 28, 2001**

(65) **Prior Publication Data**

US 2003/0224147 A1 Dec. 4, 2003

**Related U.S. Application Data**

(60) Provisional application No. 60/172,586, filed on Dec. 20, 1999.

(51) Int. Cl.[7] .............................................. **B29C 47/78**
(52) U.S. Cl. ......................... **264/211.1**; 524/9; 524/13; 264/288.8; 264/291
(58) Field of Search ...................... 264/211.12, 211.2, 264/288.4, 288.8, 291; 524/9, 13

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,228,116 A    10/1980 Colombo et al.

| | | | | |
|---|---|---|---|---|
| 5,088,910 A | * | 2/1992 | Goforth et al. | 425/142 |
| 5,169,587 A | * | 12/1992 | Courval | 264/323 |
| 5,516,472 A | * | 5/1996 | Laver | 264/118 |
| 5,951,927 A | | 9/1999 | Cope | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 198 54 475 A1 | 7/1999 | |
| EP | 0 783 064 A1 | 7/1997 | |
| EP | 0 988 947 A1 | 3/2000 | |
| GB | 2060469 B | 9/1983 | |
| JP | 07 109373 | 4/1995 | |
| JP | 10071636 | 3/1998 | |

OTHER PUBLICATIONS

International Preliminary Examination Report dated Aug. 2, 2002.

International Search Report Nov. 5, 2001.

* cited by examiner

Primary Examiner—Mary Lynn Theisen
(74) Attorney, Agent, or Firm—Pearne & Gordon LLP

(57) **ABSTRACT**

A system and method for extruding composite material and the composite material therefrom. The composite material consists of a filler mixed with a binding agent. The composite material is extruded as billets with enhanced physical properties, such as color, texture, electrical conductivity and fire retardancy, and contains a dispersion pattern of the filler material. A system and method are also provided for drawing the composite material through a die and a composite material produced thereby. The drawn composite material exhibits a density reduction over the density of the starting material and enhanced physical properties. A particularly useful tongue and groove arrangement are also provided for joining adjacent strips of a composite material made according to the extrusion process.

**10 Claims, 5 Drawing Sheets**





<u>**Figure 1**</u>



Fig 2



Figure 3



FiG 4



Fig. 5



Fig 6

US 6,939,496 B2

1

# METHOD AND APPARATUS FOR FORMING COMPOSITE MATERIAL AND COMPOSITE MATERIAL THEREFROM

This application claims the benefit of provisional application Ser. No. 60/172,586, filed Dec. 20, 1999.

The present application claims priority from PCT/CA00/01555 filed Dec. 19, 2000.

## FIELD OF THE INVENTION

The present invention relates to extrusion processes. In particular, the present invention relates to an extrusion method and apparatus for composite material.

## BACKGROUND OF THE INVENTION

The process of solid-state extrusion is known. Extrusion processes that are used include ram extrusion and hydro-static extrusion. Ram extrusion utilises a chamber in which polymer billets are placed, one end of which contains a die and the other an axially mobile ram. The billet is placed within the chamber such that the sides of the billet are touching the sides of the chamber. The mobile ram pushes the billets and forces them through the die.

In hydrostatic extrusion processes, the billet is of a smaller size than the chamber and does not come into contact with the sides of the chamber. The chamber contains a pressure generating device at one end and a die at the other. The space between the billet and the chamber is filled with a hydraulic fluid, pumped into the chamber at the end containing the pressure generating device. During operation pressure is increased on the hydraulic fluid and this in turn transmits pressure to the surface of the billet. As the billet passes through the die some of the hydraulic fluid adheres to the surface of the billet, providing additional lubrication to the process.

Both processes produce a polymer that is oriented in a longitudinal direction, having increased mechanical properties, such as tensile strength and stiffness. However, the orientation in a longitudinal direction can also make the polymer weak and subject to transverse cracking or fibrillation under abrasion. The process of pushing the polymer through a die can also create surface imperfections caused by frictional forces.

U.S. Pat. No. 5,204,045 to Courval et al. discloses a process for extruding polymer shapes with smooth, unbroken surfaces. The process includes heating the polymer shape to below the melting point of the polymer and then extruding the polymer through a die that is heated to a temperature at least as high as the temperature of the polymer. The process also involves melting a thin surface layer of the polymer to form a thin, smooth surface layer. The process produces a material of a uniform appearance and subsequent commercial applications are limited as a result.

## SUMMARY OF THE INVENTION

A composite material comprising an oriented polymer and a particulate filler dispersed throughout the oriented polymer. The composite material has a reduced density which is less than the combined masses of the oriented polymer and a particulate filler divided by their combined respective volumes.

The oriented polymer maybe of plastic and the particulate filler may be selected from the group consisting of wood, slate, talc, vermiculite and mica.

2

The plastic may be polypropylene, polyethylene and polyvinyl chloride and present in an amount of from 95% to 60% by weight a compared to the particulate filler.

According to one embodiment, the oriented polymer is polypropylene and the particulate filler is wood sawdust having a particle size of about 60 mesh and present in amount of from 20% to 30% by weight as compared to the weight of the oriented polymer.

A process for producing an oriented composite material, said process comprising the steps of combining:
   (i) an extrudable polymer with a particulate filler to form a starting material;
   (ii) heating and extruding said starting material into a first column;
   (iii) adjusting the temperature of said first column to a drawing temperature;
   (iv) presenting said first column to a drawing die and causing said first column to exit said drawing die in a second column having a cross-sectional area less than that of said first column;
   (v) applying a pulling force to said second column to draw said first column through said drawing die at a rate sufficient to cause orientation of said polymer and to cause said second column diminish in density to form said composite material.

The extrudable polymer may be of plastic, such as polypropylene, polyethylene or polyvinyl chloride.

The particulate filler may be wood, slate, talc, vermiculite or mica.

The extruable polymer may be present in an amount of from 95% to 60% by weight in the starting material.

According to one embodiment, the extruable polymer is polypropylene, the particulate filler is wood sawdust having a particle size of about 60 mesh, the wood sawdust being present in an amount from about 20% to 30% by weight in the starting material.

The rate of drawing through the drawing die may be sufficient to cause the composite material to have a density of from 0.5 to 0.9 of the density of the starting material.

A composite material is provided which includes a filler for enhancing the physical properties of the composite material and a binding agent mixed with the filler for permitting extrusion of the composite material in a plastic extrusion process to provide a predetermined dispersing pattern of the filler in the composite material.

The filler may be natural or synthetic fiber and the binding agent may be a polymer.

A composite material is provided which comprises a particulate material dispensed in an oriented polymer.

The particulate material may be wood sawdust having a particle size of about 60 mesh. The oriented polymer may be polyethylene with the oriented polymer forming from 60% to 95% by weight of the composite material.

A strip of composite material is provided, suitable for strip flooring and having parallel upper and lower faces with first and second parallel edges extending between the upper and lower faces. The first edge has a tongue extending therefrom with parallel upper and lower curved surfaces. The second edge has a groove extending thereinto with curved parallel opposite sides. The tongue and the groove are of complimentary curvature for the tongue of a first strip to be rotatable into registration with the groove of an adjacent strip to resist lateral separation between the first strip, and the adjacent strips by interference between the upper and lower curved surfaces and the curved parallel opposite sides.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present invention will now be described, by way of example only, with reference to the attached Figures, wherein:

US 6,939,496 B2

3                                                                                                  4

FIG. 1 illustrates a method of extruding a composite material according to the present invention;

FIG. 2 illustrates an extruder for extruding same;

FIG. 3 illustrates an extruded billet of the composite material;

FIG. 4 is an end elevation of a tongue and groove joint which may be formed in the extrusion method of the present invention;

FIG. 5 is a cross-sectional illustration of an alternate forming method according to the present invention; and

FIG. 6 is a schematic illustration of an automated process of the method of FIG. 5.

## DETAILED DESCRIPTION OF THE INVENTION

Referring now to FIG. 1 a method of extruding a composite material is shown generally at 10. A filler 12 and a binding agent 14 are placed in a feeder 16. Feeder 16 feeds a predetermined volume of filler 12 and binding agent 14 into melt extruder 18. In an embodiment, feeder 16 is a gravimetric feeder controlled by an external CPU 17. Melt extruder 18 mixes filler 12 and binding agent 14 to form feedstock 20, as is well known to those of skill in the art. Feedstock 20 then passes to an extruder 22, and is extruded to produce a composite material 24.

Filler 12 can be a natural fibre, such as wood and agricultural fibres such as hemp, flax, straw or wheat; a synthetic fibre such as nylon, polyethylene terephthalate, glass or polypropylene fibre with a polyethylene matrix. Filler 12 can also be a mineral based filler such as slate, talc, vermiculite or mica. In a presently preferred embodiment, filler 12 is a wood fibre concentrate. Filler 12 has a mesh in the range of 10–300, more preferably in the range 10–150. In the presently preferred embodiment filler 12 has a 60 mesh.

Binding agent 14 is a polymer or other suitable extrudable plastic, such as polypropylene (PP), polyethylene (PE) or polyvinyl chloride (PVC). Binding agent 14 forms approximately 55–95% by weight of feedstock 20. Other ranges for the % weight of binding agent 14 in feedstock 20 may be appropriate depending on the filler chosen. More limited ranges of 60–95% or 70–90% may be required depending on the chosen filler 12.

Once filler 12 and binding agent 14 have been fed to feeder 16, they pass to melt extruder 18. A predetermined volume of filler 12, in accordance with the % weight of binding agent 14 that is used, and binding agent 14 are mixed in melt extruder 18 and extruded in a conventional manner to produce feedstock 20. The resultant feedstock 20 is fed by melt extruder 18 to extruder 22.

FIG. 2 illustrates a preferred embodiment of extruder 22. Extruder 22 has a ram 34, a pressure chamber 30 and a die 38. The method and apparatus of the extrusion process are detailed in U.S. Pat. No. 5,169,589 to Francoeur et al., U.S. Pat. No. 5,204,045 to Courval et al. and U.S. Pat. No. 5,169,587 to Courval, the contents of which are incorporated herein by reference. The method of the extrusion process produces a highly oriented polymer profile. The resultant composite material 24, produced by this process, generally has a higher tensile strength and modulus than feedstock 20. In the presently preferred embodiment an oriented product 48 of composite material 24, formed with a wood-fibre concentrate filler is produced in standard widths of 2 inches, 3 inches or 6 inches (5.08 cm, 7.62 cm or 15.24 cm).

FIG. 3 illustrates an oriented product 48 of composite material 24. Produced in the manner outlined above, com-

posite material 24 has striations 50 of filler 12, formed in a dispersion pattern with a wood-grain appearance. The resultant oriented product 48 resembles hard wood flooring and can be adapted to be used in commercial applications as such. Appropriate attaching means, such as a tongue and groove, or snap lock, can be subsequently tooled in to the oriented material to create a product that can be attached in series in a commercial application, such as flooring of furniture manufacturing. Surface treatment can also be applied to the billet for increasing the surface properties of the billet, such as adding a protective coating, such as polyurethane, to protect the surface layer from scratching.

By varying parameters of the ram extrusion process, such as temperature, pressure and die contours, properties of composite material 24 can be changed. The properties of composite material 24 can also be changed by varying amounts of filler 12, and by changing the composition of filler 12. This will affect the physical properties of composite material 24, such as colour, texture, electrical conductivity, glow in the dark and fire retardancy.

The oriented product 48 of composite material 24 can be manipulated in order to meet a manufacturer's specifications with regards to the final commercial application. Oriented product 48 can be cut and shaped during the ram extruding process. In the presently preferred embodiment, composite material 24 is extruded as oriented product 48 of varying specifications, however it can also be extruded as a sheet for use in commercial applications such as indoor and outdoor furniture manufacturing.

The present invention provides a new composite material, and a method and apparatus for extruding the composite material. The invention includes the initial mixing of a binding agent and a filler to produce a feedstock which is subsequently extruded as a billet of a composite material. The composite material is stronger and more durable then the starting materials. The composite material also contains striations of the filler which allows the manufacturer to produce a composite material that can reflect the image of a natural product and can be used in commercial applications such as floor coverings. The properties of the composite material can also be changed, in order to meet the requirements for the commercial application of the product, by the incorporation of different types of filler and by varying the amount of filler used.

FIG. 4 is an end elevation showing a particularly advantageous tongue and groove configuration which can be formed along opposite edges of the oriented product 48 of the composite material 24. A first edge 50 has a tongue 52 formed thereon having an upper concave face 54 and a lower convex face 56. The opposite edge 60 has a groove 62 with an upper convex edge 64 and a lower concave edge 66. The tongue 52 and the groove 62 register to allow the tongue to be initially inserted into the groove 62 of an adjacent strip of oriented product 48 at a relative angle on the order of 45° between the adjacent strips of oriented product 48 and then rotated into place in the direction of arrow 70 so that the tongue 52 nests in the groove 62 with the adjacent strips of oriented product in a parallel side by side configuration.

Once the tongue 52 and the groove 62 are nested, removal in a lateral direction indicated by arrows 80 is prevented first by interference between an upper edge 58 of the tongue and a depending edge 68 of the groove. Lateral separation is further inhibited by an upwardly extending edge 69 of the groove 62 interfering with a lowermost portion 59 of the tongue 52.

Extrusion rates for the composite material 24 will vary depending on various factors such as the particular compos-

5

6

ite material 24 selected, the degree of reduction, and the cross-sectional area of the extruded strip or column. Extrusion rates are however rather slow and rates on the order of six inches per minute (6 in./min.) are not atypical.

It has been found that rater than extruding the composite material 24, by pressing it through the die 38, the composite material may be drawn through the die 38. FIG. 5 illustrates such a drawing process.

One manner of drawing the composite material through the die 38 is to initially commence by extrusion, as discussed above. Once an end 100 of the oriented product 48 begins to emerge from the die 38, the end may be grasped, such as by a clamp 102 and pulled. The pulling would typically be done with no further pressing force being applied and yields an oriented end product 104.

In tests, pulling rates of up to 14 ft./min. (fourteen feet per minute) have been achieved which was limited by machine capacity. It is expected that pulling rates of 20 ft./min. (twenty feet per minute) are entirely feasible.

The properties of the oriented end product 104 produced by drawing are significantly different than those produced by extrusion. By way of example, a starting billet 110 was first formed by combining a wood fiber plastic concentrate containing 60% wood particles of about 60 mesh size and 50% polypropylene with virgin polypropylene in a 1:1 ratio. This yielded a composition having about 30% wood fiber and 70% polypropylene. The resulting combination was heated and extruded to form the billet 110.

The billet 110 was of rectangular cross-section measuring about two inches by two inches (2"×2"). The billet 110 was heated in an oven to about 150° C. (ie. close to but below the melting point of polypropylene which is about 160° C.) and transferred to the pressure chamber 30 and initially forced through the die 38. The extruded material was then grasped using the clamp 102 and drawn at a rate of about 4 ft./min. (Four feet per minute) and once it had been entirely drawn through the die 38, allowed to cool into the oriented end product 104. The draw ratio (i.e. the initial cross-sectional area divided by the final cross-sectional area) was 10:4.

The oriented end product 104 bore a remarkable similarity both in look and in feel to wood. The oriented end product 104 diminished in density by about half compared to the starting billet 110. The density of the oriented end product 104 was about 0.59 g/cc (grams per cubic centimeter) compared to a density of about 1 g/cc for the starting billet 110.

The oriented end product 104 could be shaped as if it were wood and in planing and sawing behaved very much like wood producing shavings remarkably like wood shavings and sawdust remarkably like wood sawdust. The oriented end product 104 received both nails and screws without splitting much like wood.

In testing, the oriented end product was found to have a density and flexural strength not unlike wood and a modulus of elasticity of about half that of wood. Typical properties were a density of 0.059 g/cc, flexural strength of 6,353 lb/in$^2$ and a modulus of elasticity of 799,298 lb/in$^2$. Unlike wood however the oriented product 104 was virtually non adsorptive to water.

Although testing was carried out using a starting billet 110, the process can no doubt be automated as schematically illustrated in FIG. 6. FIG. 6 shows an extruder 120 in which feed materials 121 may be blended and extruded through a die 122 into a first column 124. The first column 124 is fed through a first haul off 125 into a continuous furnace 126

where its temperature is adjusted to a drawing temperature. The first haul off 125 acts against the extrusion direction to maintain extrusion pressure and to support the column 124. The temperature adjusted first column 124 is fed into a drawing die 128 at the exit of which it is reduced in size to a second column 130. The second column 130 is grasped by a suitable haul off 132 such as sold under the trademark CATERPILLAR as it exits the drawing die 128. The haul off 132 then pulls the second column 130 at a desired rate to form an oriented product 138.

The above-described embodiments of the invention are intended to be examples of the present invention and alterations and modifications may be effected thereto, by those of skill in the art, without departing from the scope of the invention which is defined solely by the claims appended hereto.

We claim:

1. A process for producing an oriented composite material, said process comprising the steps of:

i) combining an extrudable polymer with a cellulose based particulate filler to form a starting material;

ii) heating and extruding said starting material into a first column;

iii) adjusting the temperature of said first column to a drawing temperature;

iv) presenting said first column to a drawing die and causing said first column to exit said drawing die in a second column having a cross-sectional area less than that of said first column;

v) applying a pulling force to said second column to draw said first column through said drawing die at a rate sufficient to cause orientation of said polymer and to cause said second column to diminish in density to form said composite material.

2. A process according to claim 1 wherein:

said extrudable polymer is selected from the group consisting of polypropylene, polyethylene and polyvinyl chloride.

3. A process according to claim 1 wherein:

said extrudable polymer is a plastic; and

said particulate filler is selected from the group consisting of wood, hemp, flax, straw and wheat.

4. A process according to claim 2 wherein:

said extrudable polymer is present in an amount of from 95 to 60 percent by weight in said starting material.

5. A process according to claim 4 wherein:

said particulate filler is selected from the group consisting of wood, hemp, flax, straw and wheat.

6. A process according to claim 5 wherein:

said extrudable polymer is polypropylene; and

said particulate filler is wood sawdust.

7. A process according to claim 5 wherein:

said wood sawdust has a particle size of about 60 mesh.

8. A process according to claim 7 wherein:

said wood sawdust in present in an amount of from about 20% to 30% by weight in said starting material.

9. A process according to claim 1 wherein:

said second drawing die has a drawn ratio of from 4 to 20.

10. A process according to claim 1 wherein:

said rate of drawing through said drawing die is sufficient to cause said composite material to have a density of from 0.5 to 0.9 of the density of said starting material.

* * * * *

# EXHIBIT B

US 20050171246A1

(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: **US 2005/0171246 A1**
Maine et al. (43) **Pub. Date:** **Aug. 4, 2005**

(54) **METHOD AND APPARATUS FOR FORMING COMPOSITE MATERIAL AND COMPOSITE MATERIAL THEREFROM**

(75) Inventors: **Francis William Maine**, Ontario (CA); **William Roy Newson**, Ontario (CA)

Correspondence Address:
**PEARNE & GORDON LLP**
**1801 EAST 9TH STREET**
**SUITE 1200**
**CLEVELAND, OH 44114-3108 (US)**

(73) Assignee: **PSI International Inc.**

(21) Appl. No.: **11/065,787**

(22) Filed: **Feb. 25, 2005**

**Related U.S. Application Data**

(62) Division of application No. 10/168,716, filed on Oct. 28, 2002, filed as 371 of international application No. PCT/CA00/01555, filed on Dec. 19, 2000.

(60) Provisional application No. 60/172,586, filed on Dec. 20, 1999.

**Publication Classification**

(51) Int. Cl.[7] .................................................. C08J 3/00
(52) U.S. Cl. ............................ 524/13; 524/27; 524/449; 524/451; 524/543

(57) **ABSTRACT**

A system and method for extruding composite material and the composite material therefrom. The composite material consists of a filler mixed with a binding agent. The composite material is extruded as billets with enhanced physical properties, such as colour, texture, electrical conductivity and fire retardancy, and contains a dispersion pattern of the filler material. A system and method are also provided for drawing the composite material through a die and a composite material produced thereby. The drawn composite material exhibits a density reduction over the density of the starting material and enhanced physical properties. A particularly useful tongue and groove arrangement are also provided for joining adjacent strips of a composite material made according to the extrusion process.



Figure 1

Patent Application Publication    Aug. 4, 2005   Sheet 2 of 5        US 2005/0171246 A1



22

34

30

38

Fig 2

Figure 3



48

50

24



FIG 4



Fig. 5



Fig 6

US 2005/0171246 A1

Aug. 4, 2005

1

# METHOD AND APPARATUS FOR FORMING COMPOSITE MATERIAL AND COMPOSITE MATERIAL THEREFROM

## FIELD OF THE INVENTION

[0001] The present invention relates to extrusion processes. In particular, the present invention relates to an extrusion method and apparatus for composite material.

## BACKGROUND OF THE INVENTION

[0002] The process of solid-state extrusion is known. Extrusion processes that are used include ram extrusion and hydrostatic extrusion. Ram extrusion utilises a chamber in which polymer billets are placed, one end of which contains a die and the other an axially mobile ram. The billet is placed within the chamber such that the sides of the billet are touching the sides of the chamber. The mobile ram pushes the billets and forces them through the die.

[0003] In hydrostatic extrusion processes, the billet is of a smaller size than the chamber and does not come into contact with the sides of the chamber. The chamber contains a pressure generating device at one end and a die at the other. The space between the billet and the chamber is filled with a hydraulic fluid, pumped into the chamber at the end containing the pressure generating device. During operation pressure is increased on the hydraulic fluid and this in turn transmits pressure to the surface of the billet. As the billet passes through the die some of the hydraulic fluid adheres to the surface of the billet, providing additional lubrication to the process.

[0004] Both processes produce a polymer that is oriented in a longitudinal direction, having increased mechanical properties, such as tensile strength and stiffness. However, the orientation in a longitudinal direction can also make the polymer weak and subject to transverse cracking or fibrillation under abrasion. The process of pushing the polymer through a die can also create surface imperfections caused by frictional forces.

[0005] U.S. Pat. No. 5,204,045 to Courval et al. discloses a process for extruding polymer shapes with smooth, unbroken surfaces. The process includes heating the polymer shape to below the melting point of the polymer and then extruding the polymer through a die that is heated to a temperature at least as high as the temperature of the polymer. The process also involves melting a thin surface layer of the polymer to form a thin, smooth surface layer. The process produces a material of a uniform appearance and subsequent commercial applications are limited as a result.

## SUMMARY OF THE INVENTION

[0006] A composite material comprising an oriented polymer and a particulate filler dispersed throughout the oriented polymer. The composite material has a reduced density which is less than the combined masses of the oriented polymer and a particulate filler divided by their combined respective volumes.

[0007] The oriented polymer maybe of plastic and the particulate filler may be selected from the group consisting of wood, slate, talc, vermiculite and mica.

[0008] The plastic may be polypropylene, polyethylene and polyvinyl chloride and present in an amount of from 95% to 60% by weight as compared to the particulate filler.

[0009] According to one embodiment, the oriented polymer is polypropylene and the particulate filler is wood sawdust having a particle size of about 60 mesh and present in amount of from 20% to 30% by weight as compared to the weight of the oriented polymer.

[0010] A process for producing an oriented composite material, said process comprising the steps

[0011] of combining:

[0012] (i) an extrudable polymer with a particulate filler to form a starting material;

[0013] (ii) heating and extruding said starting material into a first column;

[0014] (iii) adjusting the temperature of said first column to a drawing temperature;

[0015] (iv) presenting said first column to a drawing die and causing said first column to exit said drawing die in a second column having a cross-sectional area less than that of said first column;

[0016] (v) applying a pulling force to said second column to draw said first column through said drawing die at a rate sufficient to cause orientation of said polymer and to cause said second column diminish in density to form said composite material.

[0017] The extrudable polymer may be of plastic, such as polypropylene, polyethylene or polyvinyl chloride.

[0018] The particulate filler may be wood, slate, talc, vermiculite or mica.

[0019] The extrudable polymer may be present in an amount of from 95% to 60% by weight in the starting material.

[0020] According to one embodiment, the extrudable polymer is polypropylene, the particulate filler is wood sawdust having a particle size of about 60 mesh, the wood sawdust being present in an amount from about 20% to 30% by weight in the starting material.

[0021] The rate of drawing through the drawing die may be sufficient to cause the composite material to have a density of from 0.5 to 0.9 of the density of the starting material.

[0022] A composite material is provided which includes a filler for enhancing the physical properties of the composite material and a binding agent mixed with the filler for permitting extrusion of the composite material in a plastic extrusion process to provide a predetermined dispersion pattern of the filler in the composite material.

[0023] The filler may be natural or synthetic fiber and the binding agent may be a polymer.

[0024] A composite material is provided which comprises a particulate material dispersed in an oriented polymer.

[0025] The particulate material may be wood sawdust having a particle size of about 60 mesh. The oriented

2

polymer may be polyethylene with the oriented polymer forming from 60% to 95% by weight of the composite material.

[0026] A strip of composite material is provided, suitable for strip flooring and having parallel upper and lower faces with first and second parallel edges extending between the upper and lower faces. The first edge has a tongue extending therefrom with parallel upper and lower curved surfaces. The second edge has a groove extending thereinto with curved parallel opposite sides. The tongue and the groove are of complimentary curvature for the tongue of a first strip to be rotatable into registration with the groove of an adjacent strip to resist lateral separation between the first strip, and the adjacent strips by interference between the upper and lower curved surfaces and the curved parallel opposite sides.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0027] Preferred embodiments of the present invention will now be described, by way of example only, with reference to the attached Figures, wherein:

[0028] FIG. 1 illustrates a method of extruding a composite material according to the present invention;

[0029] FIG. 2 illustrates an extruder for extruding same;

[0030] FIG. 3 illustrates an extruded billet of the composite material;

[0031] FIG. 4 is an end elevation of a tongue and groove joint which may be formed in the extrusion method of the present invention;

[0032] FIG. 5 is a cross-sectional illustration of an alternate forming method according to the present invention; and

[0033] FIG. 6 is a schematic illustration of an automated process of the method of FIG. 5.

## DETAILED DESCRIPTION OF THE INVENTION

[0034] Referring now to FIG. 1 a method of extruding a composite material is shown generally at 10. A filler 12 and a binding agent 14 are placed in a feeder 16. Feeder 16 feeds a predetermined volume of filler 12 and binding agent 14 into melt extruder 18. In an embodiment, feeder 16 is a gravimetric feeder controlled by an external CPU 17. Melt extruder 18 mixes filler 12 and binding agent 14 to form feedstock 20, as is well known to those of skill in the art. Feedstock 20 then passes to an extruder 22, and is extruded to produce a composite material 24.

[0035] Filler 12 can be a natural fibre, such as wood and agricultural fibres such as hemp, flax, straw or wheat; a synthetic fibre such as nylon, polyethylene terephthalate, glass or polypropylene fibre with a polyethylene matrix. Filler 12 can also be a mineral based filler such as slate, talc, vermiculite or mica. In a presently preferred embodiment, filler 12 is a wood fibre concentrate. Filler 12 has a mesh in the range of 10-300, more preferably in the range 10-150. In the presently preferred embodiment filler 12 has a 60 mesh.

[0036] Binding agent 14 is a polymer or other suitable extrudable plastic, such as polypropylene (PP), polyethylene (PE) or polyvinyl chloride (PVC). Binding agent 14 forms approximately 55-95% by weight of feedstock 20. Other

ranges for the % weight of binding agent 14 in feedstock 20 may be appropriate depending on the filler chosen. More limited ranges of 60-95% or 70-90% may be required depending on the chosen filler 12.

[0037] Once filler 12 and binding agent 14 have been fed to feeder 16, they pass to melt extruder 18. A predetermined volume of filler 12, in accordance with the % weight of binding agent 14 that is used, and binding agent 14 are mixed in melt extruder 18 and extruded in a conventional manner to produce feedstock 20. The resultant feedstock 20 is fed by melt extruder 18 to extruder 22.

[0038] FIG. 2 illustrates a preferred embodiment of extruder 22. Extruder 22 has a ram 34, a pressure chamber 30 and a die 38. The method and apparatus of the extrusion process are detailed in U.S. Pat. No. 5,169,589 to Francoeur et al., U.S. Pat. No. 5,204,045 to Courval et al. and U.S. Pat. No. 5,169,587 to Courval, the contents of which are incorporated herein by reference. The method of the extrusion process produces a highly oriented polymer profile. The resultant composite material 24, produced by this process, generally has a higher tensile strength and modulus than feedstock 20. In the presently preferred embodiment an oriented product 48 of composite material 24, formed with a wood-fibre concentrate filler is produced in standard widths of 2 inches, 3 inches or 6 inches (5.08 cm, 7.62 cm or 15.24 cm).

[0039] FIG. 3 illustrates an oriented product 48 of composite material 24. Produced in the manner outlined above, composite material 24 has striations 50 of filler 12, formed in a dispersion pattern with a wood-grain appearance. The resultant oriented product 48 resembles hard wood flooring and can be adapted to be used in commercial applications as such. Appropriate attaching means, such as a tongue and groove, or snap lock, can be subsequently tooled in to the oriented material to create a product that can be attached in series in a commercial application, such as flooring or furniture manufacturing. Surface treatment can also be applied to the billet for increasing the surface properties of the billet, such as adding a protective coating, such as polyurethane, to protect the surface layer from scratching.

[0040] By varying parameters of the ram extrusion process, such as temperature, pressure and die contours, properties of composite material 24 can be changed. The properties of composite material 24 can also be changed by varying amounts of filler 12, and by changing the composition of filler 12. This will affect the physical properties of composite material 24, such as colour, texture, electrical conductivity, glow in the dark and fire retardancy.

[0041] The oriented product 48 of composite material 24 can be manipulated in order to meet a manufacturer's specifications with regards to the final commercial application. Oriented product 48 can be cut and shaped during the ram extruding process. In the presently preferred embodiment, composite material 24 is extruded as oriented product 48 of varying specifications, however it can also be extruded as a sheet for use in commercial applications such as indoor and outdoor furniture manufacturing.

[0042] The present invention provides a new composite material, and a method and apparatus for extruding the composite material. The invention includes the initial mixing of a binding agent and a filler to produce a feedstock

which is subsequently extruded as a billet of a composite material. The composite material is stronger and more durable then the starting materials. The composite material also contains striations of the filler which allows the manufacturer to produce a composite material that can reflect the image of a natural product and can be used in commercial applications such as floor coverings. The properties of the composite material can also be changed, in order to met the requirements for the commercial application of the product, by the incorporation of different types of filler and by varying the amount of filler used.

[0043] FIG. 4 is an end elevation showing a particularly advantageous tongue and groove configuration which can be formed along opposite edges of the oriented product 48 of the composite material 24. A first edge 50 has a tongue 52 formed thereon having an upper concave face 54 and a lower convex face 56. The opposite edge 60 has a groove 62 with an upper convex edge 64 and a lower concave edge 66. The tongue 52 and the groove 62 register to allow the tongue to be initially inserted into the groove 62 of an adjacent strip of oriented product 48 at a relative angle on the order of 45° between the adjacent strips of oriented product 48 and then rotated into place in the direction of arrow 70 so that the tongue 52 nests in the groove 62 with the adjacent strips of oriented product in a parallel side by side configuration.

[0044] Once the tongue 52 and the groove 62 are nested, removal in a lateral direction indicated by arrows 80 is prevented first by interference between an upper edge 58 of the tongue and a depending edge 68 of the groove. Lateral separation is further inhibited by an upwardly extending edge 69 of the groove 62 interfering with a lowermost portion 59 of the tongue 52.

[0045] Extrusion rates for the composite material 24 will vary depending on various factors such as the particular composite material 24 selected, the degree of reduction, and the cross-sectional area of the extruded strip or column. Extrusion rates are however rather slow and rates on the order of six inches per minute (6 in./min.) are not atypical.

[0046] It has been found that rather than extruding the composite material 24, by pressing it through the die 38, the composite material may be drawn through the die 38. FIG. 5 illustrates such a drawing process.

[0047] One manner of drawing the composite material through the die 38 is to initially commence by extrusion, as discussed above. Once an end 100 of the oriented product 48 begins to emerge from the die 38, the end may be grasped, such as by a clamp 102 and pulled. The pulling would typically be done with no further pressing force being applied and yields an oriented end product 104.

[0048] In tests, pulling rates of up to 14 ft./min. (fourteen feet per minute) have been achieved which was limited by machine capacity. It is expected that pulling rates of 20 ft./min. (twenty feet per minute) are entirely feasible.

[0049] The properties of the oriented end product 104 produced by drawing are significantly different than those produced by extrusion. By way of example, a starting billet 110 was first formed by combining a wood fiber plastic concentrate containing 60% wood particles of about 60 mesh size and 50% polypropylene with virgin polypropylene in a 1:1 ratio. This yielded a composition having about 30% wood fiber and 70% polypropylene. The resulting combination was heated and extruded to form the billet 110.

[0050] The billet 110 was of rectangular cross-section measuring about two inches by two inches (2"×2"). The

billet 110 was heated in an oven to about 150° C. (ie. close to but below the melting point of polypropylene which is about 160° C.) and transferred to the pressure chamber 30 and initially forced through the die 38. The extruded material was then grasped using the clamp 102 and drawn at a rate of about 4 ft./min. (Four feet per minute) and once it had been entirely drawn through the die 38, allowed to cool into the oriented end product 104. The draw ratio (i.e. the initial cross-sectional area divided by the final cross-sectional area) was 10:4.

[0051] The oriented end product 104 bore a remarkable similarity both in look and in feel to wood. The oriented end product 104 diminished in density by about half compared to the starting billet 110. The density of the oriented end product 104 was about 0.59 g/cc (grams per cubic centimeter) compared to a density of about 1 g/cc for the starting billet 110.

[0052] The oriented end product 104 could be shaped as if it were wood and in planing and sawing behaved very much like wood producing shavings remarkably like wood shavings and sawdust remarkably like wood sawdust. The oriented end product 104 received both nails and screws without splitting much like wood.

[0053] In testing, the oriented end product was found to have a density and flexural strength not unlike wood and a modulus of elasticity of about half that of wood. Typical properties were a density of 0.059 g/cc, flexural strength of 6,353 lb/in² and a modulus of elasticity of 799,298 lb/in². Unlike wood however the oriented product 104 was virtually non adsorptive to water.

[0054] Although testing was carried out using a starting billet 110, the process can no doubt be automated as schematically illustrated in FIG. 6. FIG. 6 shows an extruder 120 in which feed materials 121 may be blended and extruded through a die 122 into a first column 124. The first column 124 is fed through a first haul off 125 into a continuous furnace 126 where its temperature is adjusted to a drawing temperature. The first haul off 125 acts against the extrusion direction to maintain extrusion pressure and to support the column 124. The temperature adjusted first column 124 is fed into a drawing die 128 at the exit of which it is reduced in size to a second column 130. The second column 130 is grasped by a suitable haul off 132 such as sold under the trademark CATERPILLAR as it exits the drawing die 128. The haul off 132 then pulls the second column 130 at a desired rate to form an oriented product 138.

[0055] The above-described embodiments of the invention are intended to be examples of the present invention and alterations and modifications may be effected thereto, by those of skill in the art, without departing from the scope of the invention which is defined solely by the claims appended hereto.

What is claimed is:

1. A composite material comprising:

an oriented polymer; and

a particulate filler dispersed throughout said oriented polymer,

wherein said composite material has a reduced density which is less than the combined masses of the oriented polymer and particulate filler divided by their combined respective volumes.

US 2005/0171246 A1

Aug. 4, 2005

4

**2**. The composite material of claim 1 wherein:

said oriented polymer is a plastic; and

said particulate filler is selected from the group consisting of wood, slate, talc, vermiculite and mica.

**3**. The composite material of claim 2 wherein:

said oriented polymer is selected from the group consisting of polypropylene, polyethylene and polyvinyl chloride.

**4**. The composite material of claim 1 where:

said oriented polymer is present in an amount of from 95 to 60 percent by weight as compared to said particulate filler.

**5**. The composite material of claim 4 wherein:

said oriented polymer is selected from the group consisting of polypropylene, polyethylene, and polyvinyl chloride.

**6**. The composite material of claim 4 wherein:

said particulate filler is selected from the group consisting of wood, slate, talc, vermiculite and mica.

**7**. The composite material of claim 4 wherein:

said oriented polymer is polypropylene; and

said particulate filler is wood sawdust.

**8**. The composite material of claim 7 wherein:

said sawdust has a particle size of about 60 mesh.

**9**. The composite material of claim 8 wherein:

said particulate filler is present in an amount of from 20% to 30% by weight as compared to said oriented polymer.

**20**. An oriented composite material as produced by a process comprising the steps of:

i) combining an extrudable polymer with a cellulose based particulate filler to form a starting material;

ii) heating and extruding said starting material into a first column;

iii) adjusting the temperature of said first column to a drawing temperature;

iv) presenting said first column to a drawing die and causing said first column to exit said drawing die in a second column having a cross-sectional area less than that of said first column;

v) applying a pulling force to said second column to draw said first column through said drawing die at a rate sufficient to cause orientation of said polymer and to cause said second column to diminish in density to form said composite material.

**21**. A composite material comprising:

a filler for enhancing the physical properties of said composite material; and a binding agent, mixed with said filler, for permitting extrusion of billet of said composite material in a plastic extrusion process to provide a predetermined dispersion pattern of said filler in said composite material.

**22**. The composite material of claim 21 wherein said filler is a natural fiber.

**23**. The composite material of claim 21 wherein said filler is a synthetic fiber.

**24**. The composite material of claim 21 wherein said binding agent is a polymer.

**25**. A composite material comprising a particulate material dispersed in an oriented polymer.

**26**. The composite material of claim 25 wherein said particulate material is wood sawdust having a particle size of about 60 mesh;

said oriented polymer is polyethylene; and

said oriented polymer forms from 60% to 95% by weight of said composite material.

\* \* \* \* \*

# EXHIBIT C

US 20050192382A1

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: **US 2005/0192382 A1**

Maine et al.                                   (43) Pub. Date:        **Sep. 1, 2005**

(54) **METHOD AND APPARATUS FOR EXTRUDING COMPOSITE MATERIAL AND COMPOSITE MATERIAL THEREFROM**

(76) Inventors: **Francis William Maine**, Ontario (CA);
      **William Roy Newson**, Ontario (CA)

Correspondence Address:
**PEARNE & GORDON LLP**
**1801 EAST 9TH STREET**
**SUITE 1200**
**CLEVELAND, OH 44114-3108 (US)**

(21) Appl. No.:      11/046,628

(22) Filed:          Jan. 28, 2005

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/168,716, filed on Oct. 28, 2002, filed as 371 of international application No. PCT/CA00/01555, filed on Dec. 19, 2000.

(60) Provisional application No. 60/172,586, filed on Dec. 20, 1999.

**Publication Classification**

(51) Int. Cl.[7] ................................. **B29C 47/00**
(52) U.S. Cl. ................. **524/13**; 264/211; 264/210.1; 524/449; 524/451; 524/567; 524/543

(57)                  **ABSTRACT**

A system and method for extruding composite material and the composite material therefrom. The composite material consists of a filler mixed with a binding agent. The composite material is extruded as billets with enhanced physical properties, such as colour, texture, electrical conductivity and fire retardancy, and contains a dispersion pattern of the filler material. A system and method are also provided for drawing the composite material through a die and a composite material produced thereby. The drawn composite material exhibits a density reduction over the density of the starting material and enhanced physical properties.



Patent Application Publication   Sep. 1, 2005   Sheet 1 of 5   US 2005/0192382 A1



Figure 1

Patent Application Publication    Sep. 1, 2005   Sheet 2 of 5    US 2005/0192382 A1



Fig 2

Figure 3





FIG 4

Patent Application Publication    Sep. 1, 2005    Sheet 4 of 5    US 2005/0192382 A1



Fig. 5



US 2005/0192382 A1

1

Sep. 1, 2005

# METHOD AND APPARATUS FOR EXTRUDING COMPOSITE MATERIAL AND COMPOSITE MATERIAL THEREFROM

## RELATED U.S. APPLICATION DATA

[0001]  This application is a Continuation-in-Part of application Ser. No. 10/168,716 filed Jun. 19, 2002, a National Phase Entry application of PCT application no. PCT/CA00/01555, filed Dec. 19, 2000, which in turn claims priority from U.S. Provisional patent application Ser. No. 60/172,586, filed Dec. 20, 1999.

## FIELD OF THE INVENTION

[0002]  The present invention relates to extrusion processes. In particular, the present invention relates to an extrusion method and apparatus for composite material.

## BACKGROUND OF THE INVENTION

[0003]  The process of solid-state extrusion is known. Extrusion processes that are used include ram extrusion and hydrostatic extrusion. Ram extrusion utilises a chamber in which polymer billets are placed, one end of which contains a die and the other an axially mobile ram. The billet is placed within the chamber such that the sides of the billet are touching the sides of the chamber. The mobile ram pushes the billets and forces them through the die.

[0004]  In hydrostatic extrusion processes, the billet is of a smaller size than the chamber and does not come into contact with the sides of the chamber. The chamber contains a pressure generating device at one end and a die at the other. The space between the billet and the chamber is filled with a hydraulic fluid, pumped into the chamber at the end containing the pressure generating device. During operation pressure is increased on the hydraulic fluid and this in turn transmits pressure to the surface of the billet. As the billet passes through the die some of the hydraulic fluid adheres to the surface of the billet, providing additional lubrication to the process.

[0005]  Both processes produce a polymer that is oriented in a longitudinal direction, having increased mechanical properties, such as tensile strength and stiffness. However, the orientation in a longitudinal direction can also make the polymer weak and subject to transverse cracking or fibrillation under abrasion. The process of pushing the polymer through a die can also create surface imperfections caused by frictional forces.

[0006]  U.S. Pat. No. 5,204,045 to Courval et al. discloses a process for extruding polymer shapes with smooth, unbroken surfaces. The process includes heating the polymer shape to below the melting point of the polymer and then extruding the polymer through a die that is heated to a temperature at least as high as the temperature of the polymer. The process also involves melting a thin surface layer of the polymer to form a thin, smooth surface layer. The process produces a material of a uniform appearance and subsequent commercial applications are limited as a result.

## SUMMARY OF THE INVENTION

[0007]  A composite material comprising an oriented polymer and a particulate filler dispersed throughout the oriented polymer. The composite material has a reduced density which is less than the combined masses of the oriented polymer and a particulate filler divided by their combined respective volumes.

[0008]  The particulate filler may be non-adhering to the polymer.

[0009]  The particulate filler and the polymer are selected to have respective mismatching polarities.

[0010]  The oriented polymer may be of plastic and the particulate filler may be selected from the group consisting of wood, slate, talc, vermiculite and mica.

[0011]  The plastic may be polypropylene, polyethylene and polyvinyl chloride and present in an amount of from 95% to 60% by weight as compared to the particulate filler.

[0012]  According to one embodiment, the oriented polymer is polypropylene and the particulate filler is wood sawdust having a particle size of about 60 mesh and present in amount of from 20% to 30% by weight as compared to the weight of the oriented polymer.

[0013]  A process for producing an oriented composite material, said process comprising the steps of combining:

[0014]    (i) an extrudable polymer with a particulate filler to form a starting material, the particulate filler being non-adhering to the polymer;

[0015]    (ii) heating and extruding said staring material into a first column;

[0016]    (iii) adjusting the temperature of said first column to a drawing temperature;

[0017]    (iv) presenting said first column to a drawing die and causing said first column to exit said drawing die in a second column having a cross-sectional area less than that of said first column;

[0018]    (v) applying a pulling force to said second column to draw said first column through said drawing die at a rate sufficient to cause orientation of said polymer and to cause said second column diminish in density to form said composite material.

[0019]  The extrudable polymer may be of plastic, such as polypropylene, polyethylene or polyvinyl chloride.

[0020]  The particulate filler may be wood, slate, talc, vermiculite or mica.

[0021]  The extrudable polymer may be present in an amount of from 95% to 60% by weight in the starting material.

[0022]  According to one embodiment, the extrudable polymer is polypropylene, the particulate filler is wood sawdust having a particle size of about 60 mesh, the wood sawdust being present in an amount from about 20% to 30% by weight in the starting material.

[0023]  The rate of drawing through the drawing die may be sufficient to cause the composite material to have a density of from 0.5 to 0.9 of the density of the starting material.

[0024]  A composite material is provided which includes a filler for enhancing the physical properties of the composite material and a binding agent mixed with the filler for

permitting extrusion of the composite material in a plastic extrusion process to provide a predetermined dispersion pattern of the filler in the composite material; the filler being non-adhering to the binding agent.

[0025]  The filler and the binding agent are selected to have respective mismatching polarities.

[0026]  The filler may be natural or synthetic fiber and the binding agent may be a polymer.

[0027]  A composite material is provided which comprises a particulate material dispersed in an oriented polymer, the particulate material being non-adhering to the polymer.

[0028]  The particulate material and the polymer are selected to have respective mismatching polarities.

[0029]  The particulate material may be wood sawdust having a particle size of about 60 mesh The oriented polymer may be polyethylene with the oriented polymer forming from 60% to 95% by weight of the composite material.

[0030]  A strip of composite material is provided, suitable for strip flooring and having parallel upper and lower faces with first and second parallel edges extending between the upper and lower faces. The first edge has a tongue extending therefrom with parallel upper and lower curved surfaces. The second edge has a groove extending thereinto with curved parallel opposite sides. The tongue and the groove are of complimentary curvature for the tongue of a first strip to be rotatable into registration with the groove of an adjacent strip to resist lateral separation between the first strip, and the adjacent strips by interference between the upper and lower curved surfaces and the curved parallel opposite sides.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0031]  Preferred embodiments of the present invention will now be described, by way of example only, with reference to the attached Figures, wherein:

[0032]  FIG. 1 illustrates a method of extruding a composite material according to the present invention;

[0033]  FIG. 2 illustrates an extruder for extruding same;

[0034]  FIG. 3 illustrates an extruded billet of the composite material;

[0035]  FIG. 4 is an end elevation of a tongue and groove joint which may be formed in the extrusion method of the present invention;

[0036]  FIG. 5 is a cross-sectional illustration of an alternate forming method according to the present invention; and

[0037]  FIG. 6 is a schematic illustration of an automated process of the method of FIG. 5.

## DETAILED DESCRIPTION OF THE INVENTION

[0038]  Referring now to FIG. 1 a method of extruding a composite material is shown generally at 10. A filler 12 and a binding agent 14 are placed in a feeder 16. Feeder 16 feeds a predetermined volume of filler 12 and binding agent 14 into melt extruder 18. In an embodiment, feeder 16 is a gravimetric feeder controlled by an external CPU 17. Melt

extruder 18 mixes filler 12 and binding agent 14 to form feedstock 20, as is well known to those of skill in the art. Feedstock 20 then passes to an extruder 22, and is extruded to produce a composite material 24.

[0039]  Filler 12 can be a natural fibre, such as wood and agricultural fibres such as hemp, flax, straw or wheat; a synthetic fibre such as nylon, polyethylene terephthalate, glass or polypropylene fibre with a polyethylene matrix. Filler 12 can also be a mineral based filler such as slate, talc, vermiculite or mica. In a presently preferred embodiment, filler 12 is a wood fibre concentrate. Filler 12 has a mesh in the range of 10-300, more preferably in the range 10-150. In the presently preferred embodiment filler 12 has a 60 mesh.

[0040]  Binding agent 14 is a polymer or other suitable extrudable plastic, such as polypropylene (PP), polyethylene (PE) or polyvinyl chloride (PVC). Binding agent 14 forms approximately 55-95% by weight of feedstock 20. Other ranges for the % weight of binding agent 14 in feedstock 20 may be appropriate depending on the filler chosen. More limited ranges of 60-95% or 70-90% may be required depending on the chosen filler 12.

[0041]  Once filler 12 and binding agent 14 have been fed to feeder 16, they pass to melt extruder 18. A predetermined volume of filler 12, in accordance with the % weight of binding agent 14 that is used, and binding agent 14 are mixed in melt extruder 18 and extruded in a conventional manner to produce feedstock 20. The resultant feedstock 20 is fed by melt extruder 18 to extruder 22.

[0042]  FIG. 2 illustrates a preferred embodiment of extruder 22. Extruder 22 has a ram 34, a pressure chamber 30 and a die 38. The method and apparatus of the extrusion process are detailed in U.S. Pat. No. 5,169,589 to Francoeur et al., U.S. Pat. No. 5,204,045 to Courval et al. and U.S. Pat. No. 5,169,587 to Courval, the contents of which are incorporated herein by reference. The method of the extrusion process produces a highly oriented polymer profile. The resultant composite material 24, produced by this process, generally has a higher tensile strength and modulus than feedstock 20. In the presently preferred embodiment an oriented product 48 of composite material 24, formed with a wood-fibre concentrate filler is produced in standard widths of 2 inches, 3 inches or 6 inches (5.08 cm, 7.62 cm or 15.24 cm).

[0043]  FIG. 3 illustrates an oriented product 48 of composite material 24. Produced in the manner outlined above, composite material 24 has striations 50 of filler 12, formed in a dispersion pattern with a wood-grain appearance. The resultant oriented product 48 resembles hard wood flooring and can be adapted to be used in commercial applications as such. Appropriate attaching means, such as a tongue and groove, or snap lock, can be subsequently tooled in to the oriented material to create a product that can be attached in series in a commercial application, such as flooring or furniture manufacturing. Surface treatment can also be applied to the billet for increasing the surface properties of the billet, such as adding a protective coating, such as polyurethane, to protect the surface layer from scratching.

[0044]  By varying parameters of the ram extrusion process, such as temperature, pressure and die contours, properties of composite material 24 can be changed. The properties of composite material 24 can also be changed by

varying amounts of filler 12, and by changing the composition of filler 12. This will affect the physical properties of composite material 24, such as colour, texture, electrical conductivity, glow in the dark and fire retardancy.

[0045] The oriented product 48 of composite material 24 can be manipulated in order to meet a manufacturer's specifications with regards to the final commercial application Oriented product 48 can be cut and shaped during the ram extruding process. In the presently preferred embodiment, composite material 24 is extruded as oriented product 48 of varying specifications, however it can also be extruded as a sheet for use in commercial applications such as indoor and outdoor furniture manufacturing.

[0046] The present invention provides a new composite material, and a method and apparatus for extruding the composite material. The invention includes the initial mixing of a binding agent and a filler to produce a feedstock which is subsequently extruded as a billet of a composite material. The composite material is stronger and more durable then the starting materials. The composite material also contains striations of the filler which allows the manufacturer to produce a composite material that can reflect the image of a natural product and can be used in commercial applications such as floor coverings. The properties of the composite material can also be changed, in order to met the requirements for the commercial application of the product, by the incorporation of different types of filler and by varying the amount of filler used.

[0047] FIG. 4 is an end elevation showing a particularly advantageous tongue and groove configuration which can be formed along opposite edges of the oriented product 48 of the composite material 24. A first edge 50 has a tongue 52 formed thereon having an upper concave face 54 and a lower convex face 56. The opposite edge 60 has a groove 62 with an upper convex edge 64 and a lower concave edge 66. The tongue 52 and the groove 62 register to allow the tongue to be initially inserted into the groove 62 of an adjacent strip of oriented product 48 at a relative angle on the order of 45° between the adjacent strips of oriented product 48 and then rotated into place in the direction of arrow 70 so that the tongue 52 nests in the groove 62 with the adjacent strips of oriented product in a parallel side by side configuration.

[0048] Once the tongue 52 and the groove 62 are nested, removal in a lateral direction indicated by arrows 80 is prevented by interference between an upper edge 58 of the tongue and a depending edge 68 of the groove. Lateral separation is further inhibited by an upwardly extending edge 69 of the groove 62 interfering with a lowermost portion 59 of the tongue 52.

[0049] Extrusion rates for the composite material 24 will vary depending on various factors such as the particular composite material 24 selected, the degree of reduction, and the cross-sectional area of the extruded strip or column. Extrusion rates are however rather slow and rates on the order of six inches per minute (6 in./min.) are not atypical.

[0050] It has been found that rather than extruding the composite material 24, by pressing it through the die 38, the composite material may be drawn through the die 38. FIG. 5 illustrates such a drawing process.

[0051] Drawing (i.e., die drawing or free drawing) the composite material results in a material having a relative density significantly less that that of its starting billet. It is believed that this reduced density is a result of the particulate filler and the polypropylene not adhering to each other (possibly due to a mismatch in the respective polarities of the particulate filler and the polypropylene), but rather remaining apart and thereby creating voids during the drawing process.

[0052] The constituent materials of the polymer matrix and the filler are selected so as to result in a mismatch of the respective matrix and filler polarities. For example, if polypropylene, which is a non-polar molecule, is selected as the constituent matrix material, a polar filler (such as wood fibre) is required in order to result in a polarity mismatch. If polyethylene terephthalate (PET), which is a polar molecule, is selected as the constituent matrix material, a non-polar filler is required in order to result in a polarity mismatch.

[0053] One manner of drawing the composite material through the die 38 is to initially commence by extrusion, as discussed above, Once an end 100 of the oriented product 48 begins to emerge from the die 38, the end may be gasped, such as by a clamp 102 and pulled. The pulling would typically be done with no further pressing force being applied and yields an oriented end product 104.

[0054] In tests, pulling rates of up to 14 ft./min. (fourteen feet per minute) have been achieved which was limited by machine capacity. It is expected that pulling rates of 20 ft./min. (twenty feet per minute) are entirely feasible.

[0055] The properties of the oriented end product 104 produced by drawing are significantly different than those produced by extrusion. By way of example, a starting billet 110 was first formed by combining a wood fiber plastic concentrate containing 60% wood particles of about 60 mesh size and 50% polypropylene with virgin polypropylene in a 1:1 ratio. This yielded a composition having about 30% wood fiber and 70% polypropylene. The resulting combination was heated and extruded to form the billet 110.

[0056] The billet 110 was of rectangular cross-section measuring about two inches by two inches (2"×2"). The billet 110 was heated in an oven to about 150° C. (ie. close to but below the melting point of polypropylene which is about 160° C.) and transferred to the pressure chamber 30 and initially forced through the die 38. The extruded material was then grasped using the clamp 102 and drawn at a rate of about 4 ft./min. (Four feet per minute) and once it had been entirely drawn through the die 38, allowed to cool into the oriented end product 104. The draw ratio (i.e. the initial cross-sectional area divided by the final cross-sectional area) was 10:4.

[0057] The oriented end product 104 bore a remarkable similarity both in look and in feel to wood. The oriented end product 104 diminished in density to about half compared to the starting billet 110. The density of the oriented end product 104 was about 0.59 g/cc (grams per cubic centimeter) compared to a density of about 1 g/cc for the starting billet 110.

[0058] The oriented end product 104 could be shaped as if it were wood and in planing and sawing behaved very much like wood producing shavings remarkably like wood shavings and sawdust remarkably like wood sawdust. The oriented end product 104 received both nails and screws without splitting much like wood.

[0059] In testing, the oriented end product was found to have a density and flexural strength not unlike wood and a modulus of elasticity of about half that of wood. Typical properties were a density of 0.059 g/cc, flexural strength of 6,353 lb/in2 and a modulus of elasticity of 799,298 lb/in2. Unlike wood however the oriented product 104 was virtually non adsorptive to water.

[0060] Although testing was carried out using a starting billet 110, the process can no doubt be automated as schematically illustrated in FIG. 6. FIG. 6 shows an extruder 120 in which feed materials 121 may be blended and extruded through a die 122 into a first column 124. The first column 124 is fed through a first haul off 125 into a continuous furnace 126 where its temperature is adjusted to a drawing temperature. The first haul off 125 acts against the extrusion direction to maintain extrusion pressure and to support the column 124. The temperature adjusted first column 124 is fed into a drawing die 128 at the exit of which it is reduced in size to a second column 130. The second column 130 is grasped by a suitable haul off 132 such as sold under the trademark CATERPILLAR as it exits the drawing die 128. The haul off 132 then pulls the second column 130 at a desired rate to form an oriented product 138.

[0061] The above-described embodiments of the invention are intended to be examples of the present invention and alterations and modifications may be effected thereto, by those of skill in the art, without departing from the scope of the invention which is defined solely by the claims appended hereto.

We claim:

1. A composite material comprising;

an oriented polymer; and

a particulate filler dispersed throughout said oriented polymer, said particulate filler being non-adhering to said polymer,

wherein said composite material has a reduced density which is less than the combined masses of the oriented polymer and particulate filler divided by their combined respective volumes.

2. The composite material of claim 1, wherein the respective polarities of said particulate filler and polymer are mismatched.

3. The composite material of claim 1 wherein:

said oriented polymer is a plastic; and

said particulate filler is selected form the group consisting of wood, agricultural fibres, slate, talc, vermiculite and mica.

4. The composite material of claim 3 wherein:

said oriented polymer is selected from the group consisting of polypropylene, polyethylene and polyvinyl chloride.

5. The composite material of claim 1 where:

said oriented polymer is present in an amount of from 95 to 60 percent by weight as compared to said particulate filler.

6. A composite material as claimed in claim 5 wherein:

said oriented polymer is selected from the group consisting of polypropylene, polyethylene, and polyvinyl chloride.

7. A composite material as claimed in claim 5 wherein:

said particulate filler is selected from the group consisting of wood, agricultural fibres, slate, talc, vermiculite and mica.

8. A composite material as claimed in claim 5 wherein:

said oriented polymer is polypropylene; and

said particulate filler is wood sawdust.

9. A composite material as claimed in claim 8 wherein:

said sawdust has a particle size of about 60 mesh.

10. A composite material as claimed in claim 9 wherein:

said particulate filler is present in an amount of from 20% to 30% by weight as compared to said oriented polymer.

11. A process for producing an oriented composite material, said process comprising the steps of:

i) combining an extrudable polymer with a particulate filler, said particulate filler being non-adhering to said polymer, to farm a starting material;

ii) heating and extruding said starting material into a first column;

iii) adjusting the temperature of said first column to a drawing temperature;

iv) presenting said first column to a drawing die and causing said first column to exit said drawing die in a second column having a cross-sectional area less than that of said first column;

v) applying a pulling force to said second column to draw said first column through said drawing die at a rate sufficient to cause orientation of said polymer and to cause said second column diminish in density to form said composite material.

12. A process according to claim 11, wherein the respective polarities of said particulate filler and polymer are mismatched.

13. A process according to claim 11 wherein:

said extrudable polymer is selected from the group consisting of polypropylene, polyethylene and polyvinyl chloride.

14. A process according to claim 11 wherein:

said extrudable polymer is a plastic; and

said particulate filler is selected from the group consisting of wood, agricultural fibres, slate, talc, vermiculite and mica.

15. A process according to claim 13 wherein:

said extrudable polymer is present in an amount of from 95 to 60 percent by weight in said starting material.

16. A process according to claim 15 wherein:

said particulate filler is selected from the group consisting of wood, agricultural fibres, slate, talc, vermiculite and mica.

17. A process according to claim 16 wherein:

said extrudable polymer is polypropylene; and said particulate filler is wood sawdust.

18. A process according to claim 16 wherein:

said wood sawdust has a particle size of about 60 mesh.

5

**19**. A process according to claim 18 wherein:

said wood sawdust is present in an amount of from about 20% to 30% by weight in said starting material.

**20**. A process according to claim 11 wherein:

said second drawing die has a drawn ratio of from 4 to 20.

**21**. A process according to claim 11 wherein:

said rate of drawing through said drawing die is sufficient to cause said composite material to have a density of from 0.5 to 0.9 of the density of said starting material.

**22**. An oriented composite material as produced by the process of claim 12.

**23**. A composite material comprising:

a filler for enhancing the physical properties of said composite material; and

a binding agent non-adhering to said filler, said binding agent being mixed with said filler, for permitting extrusion of billet of said composite material in a plastic extrusion process to provide a predetermined dispersion pattern of said filler in said composite material.

**24**. The composite material of claim 23, wherein the respective polarities of said filler and said binding agent are mismatched.

**25**. The composite material of claim 23 wherein: said filler is a natural fiber.

**26**. The composite material of claim 23 wherein: said filler is a synthetic fiber.

**27**. The composite material of claim 23 wherein:

said binding agent is a polymer.

**28**. A composite material comprising:

a particulate material dispersed in an oriented polymer, said particulate material being nonadhering to said polymer.

**29**. The composite material of claim 28, wherein the respective polarities of said particulate material and polymer are mismatched.

**30**. A composite material as claimed in claim 28 wherein:

said particulate material is wood sawdust having a particle size of about 60 mesh; said oriented polymer is polyethylene; and

said oriented polymer forms from 60% to 95% by weight of said composite material.

\* \* \* \* \*

# EXHIBIT D

DATED _____ 2004

PSA Composites Inc.

- and -

Shane Maine

- and -

SHW Technologies Inc.

- and -

PSA International Inc

- and -

BTG International Ltd

---

## TERMINATION AGREEMENT

---

BTG International Limited
10 Fleet Place
Limeburner Lane
London EC4M 7SB

Feb-27-04  09:35pm  From-Root Capital                    4163848149               T-630  P.05/08  F-768

(this Agreement)

**BETWEEN:**

(1)    PSA Composites Inc. of 40 Taggart Street, Units 3&4, Guelph, Ontario, Canada N1H 6H8 ("PSAC"); and

(2)    Shane Maine of 71 Sherwood Drive, Guelph, Ontario Canada ("Mr Maine") (for the purposes of Section 4 hereof only); and

(3)    SHW Technologies Inc. (formerly, Tech-Triangle Plastic Wire Inc.) whose company registration number in Canada is 254174-2-R and whose registered office is at 71 Sherwood Drive, Guelph, Ontario, Canada ("SHW"); and

(4)    PSA International Inc (for the purposes of Section 4 hereof only), a Barbados corporation whose registered office is at c/o First International Financial Services Inc. The Corporate Centre Bush Hill, Bay Street St. Michael, Barbados ("PSA Int."); and

(5)    BTG International Ltd whose company registration number in England and Wales is 2664412 and whose registered office is at 10 Fleet Place, Limeburner Lane, London EC4M 7SB ("BTG").

**RECITALS:**

(a)    SHW and BTG entered into a non-exclusive licence agreement relating to Die Drawing technology dated 30th September 1998 (the "DD Licence"); and

(b)    PSAC and BTG wish to enter into a licence agreement with each other, in respect of a number of BTG's patents which relate to an orientated hollows technology, on terms to be agreed; and

(c)    BTG will terminate the DD Licence provided that PSAC pay to BTG the sums set out below on the following terms:

It is agreed that:

1.    PSAC shall pay to BTG:

1.1    on or before March 31, 2004, the sum of ten thousand eight hundred and sixty four dollars and twenty five cents in United States dollars (US$10,864.25), such sum to be paid in full and final settlement of any and all amounts due to BTG by SHW or its affiliates pursuant to or as a result of the DD Licence, including amounts due under Clause 2 of the DD Licence; and

1.2    the sum of one hundred and fifty thousand pounds Sterling (£150,000) to be made in the following instalments:

1.2.1    on or before March 31, 2004, the sum of fifty thousand pounds Sterling (£50,000); and

1.2.2    on or before March 31, 2005, the sum of one hundred thousand pounds Sterling (£100,000) EXCEPT THAT in the event that PSAC is successful in concluding an equity and/or debt offering that realises for PSAC at least two million pounds Sterling (£2,000,000) in new funds prior to receipt by BTG of the payment referenced in this Clause 1.2.2, PSAC shall pay to BTG the amount otherwise due under this Clause 1.2.2 within five (5) business days of the receipt of

1



such funds by PSAC. For clarity, the total amount due to be paid by PSAC to BTG pursuant to this Clause 1.2.2 is £100,000 in the aggregate.

2.  All sums due under Clause 1.1 only:

    2.1  are exclusive of any value added tax or equivalent which shall be payable in addition;

    2.2  shall be made in full without deduction of taxes, charges and other duties (including any withholding or other income taxes) that may be imposed except where PSAC is required by law to make such deduction or withholding in which event PSAC shall forthwith pay to BTG such additional amount as shall result in the net amount received by BTG being equal to the amount which would have been received by BTG had no such deduction or withholding been made; and

    2.3  for greater certainty, all other amounts due pursuant to Clause 1 or elsewhere in this Agreement are inclusive of any of the taxes referred to in Clause 2.1 above and are not subject to any additional payment in the manner as set out in Clause 2.2 above.

3  **No Set-off.**    No payments made under this Agreement shall be refundable in any circumstances and all payments shall be made without set-off.

4  **Guarantee.**    Provided that BTG is not in default of its obligations, Mr Maine and PSA Int. guarantee on a joint and several basis the sums due from PSAC to BTG under Clause 1 above. Except for the guarantee as set out in this Clause 4, Mr. Maine and PSA Int. shall have no further liability and/or obligations under this Agreement.

5  **Termination of DD Licence.**

    5.1  Upon receipt by BTG of the sums set out in Clause 1.1, BTG forever waives its rights to pursue SHW, PSAC and/or any of their respective affiliates for any outstanding sums due to BTG pursuant to or arising out of the DD Licence, including but not limited to any amounts due under Clause 3 of the DD Licence;

    5.2  Upon receipt by BTG of the sums set out in Clause 1.2.1, the DD Licence shall terminate and all of its provisions shall thereafter be declared to be null and void and of no further force and effect. Without limiting the generality of the foregoing, BTG shall upon receipt of such sums forever waive its rights to any non-exclusive licence of rights to any intellectual property of SHW, PSAC and/or any of their affiliates that exist as of the date of this Agreement and also forever waives its (or others) right to be granted any licence whatsoever to the Licensee Improvements (as that term is defined within the DD Licence) or related know how as provided for in Clause 14 of the DD Licence; and

    5.3  For greater certainty, the termination of the DD Licence and related waivers set out in Clauses 5.1 and 5.2 above shall be effective immediately upon receipt by BTG of the applicable amounts listed in Clauses 1.1 and 1.2.1 above without any further notice or action required by the parties hereto. This clause shall survive the termination of this Agreement for any reason.

6  **Notice of Termination.** This Agreement shall be in lieu of a notice of termination of the DD Licence under Clause 12.2.1 therein.

7   **Release.** Upon receipt by BTG of the payments in accordance with Clause 1.1 and Clause 1.2.1 above only:

7.1   each of the parties hereto hereby release and forever discharge each other and their respective officers, directors, agents, employees, shareholders, partners, affiliates, related companies, associates, successors and assigns (current, future and former), and in the case of Mr. Maine his heirs, administrators, associates, successors or assigns, from any and all action, causes of action, claims and demands whatsoever, any party ever had, now have or may hereinafter have, arising in any way whatsoever out of, or related to, the DD Licence and/or the grant of licences thereunder, save and except only for obligations pursuant to this Agreement;

7.2   each of the parties hereto agree not to make any claim, or commence, institute or maintain any action, proceeding or appeal against any person or corporation in which any claim could arise for contribution or indemnity under the provisions of any statute or otherwise from any person or corporation discharged by the release granted hereunder with respect to any matter subject to the release hereunder; and

7.3   for greater certainty, the releases set out in Clauses 7.1 and 7.2 above shall be effective immediately upon receipt by BTG of the amounts listed in Clauses 1.1 and 1.2.1 above without any further notice or action required by the parties hereto. This clause shall survive the termination of this Agreement for any reason.

8   **Acknowledgement.** BTG hereby acknowledges and agrees that except for the DD Licence and this Agreement, SHW, PSAC and Mr. Maine have not entered into any other licence agreement with BTG.

9   **No Waiver.** The failure or delay by either party to exercise or enforce any rights under this Agreement shall not be deemed to be a waiver of any such rights, nor shall any single or partial exercise of any right, power, or privilege, or further exercise thereof, operate so as to bar the exercise or enforcement thereof at any later time.

10   **Idem.** The waiver by either party of any breach of any of the terms of this Agreement by the other shall not be deemed to be a waiver of any subsequent or continuing breach of the Agreement.

11   **Severance.** If any part or provision of this Agreement is prohibited, or rendered void or unenforceable under law, the validity or enforceability of the Agreement as a whole or of any other part of this Agreement shall not be affected; however, if this results in a material alteration to the terms and conditions of this Agreement, the parties will negotiate in good faith an amendment to the terms and conditions thereof to restore to each party the benefits of its bargain to the extent reasonably possible under the circumstances.

12   **Entire Agreement.** This Agreement represents the entire agreement between the parties in relation to the subject matter contained in this Agreement and supersedes all other agreements and representations made by either party, whether oral or written provided that nothing in this Agreement will operate to exclude or restrict any liability for fraud. This Agreement may only be modified if such modification is in writing and signed by a duly authorised representative of each party.

13   **No Third Party Rights.** Except for the termination and related waivers given in Clause 5 above and the releases given in Clause 7 above, the parties do not intended

that a third party should have the right to enforce a provision of this Agreement pursuant to the Contracts (Rights of Third Parties) Act 1999. The Parties may rescind or vary this Agreement without the consent of a third party to whom an express right to enforce any of its terms has been provided.

14    **Governing Law.**  This Agreement is to be construed in accordance with, and governed by English law.

15    **Counterparts.** This Agreement may be executed in several counterparts in the same form and such counterparts as so executed shall together form one original agreement, and such counterparts, if more than one, shall be read together and construed as if all signing parties hereto had executed one copy of this Agreement.

16    **Enurement.** This Agreement shall enure to the benefit of and be binding upon the parties hereto and each of their heirs, executors, administrators, successors and assigns.

17    **Further Assurances.** Each of the parties hereto upon the request of any other party shall do, execute, acknowledge and deliver or cause to be done, executed, acknowledged or delivered all such further acts, deeds, documents, assignments, transfers, conveyances, and assurances as may be reasonably necessary to complete the transactions contemplated by this Agreement.

This document has been executed as a Deed the day and year first above written by authorised representatives of each of the parties:.

Executed in the manner legally                )
binding on SHW TECHNOLOGIES INC.              )

Authorised signatory
Name:  FRANK  MAINE

Authorised signatory (or witness)

Name of Witness:    Mary-Eva Maine

Address:    71 SHERWOOD DRIVE

GUELPH, ONT.

N1E 6E6

Occupation:    Office Manager

Feb-27-04  03:34pm    From-Root Capital                    4163648149              T-830   P.02/09   F-768

binding on PSA COMPOSITES )
INC:                    )

Authorised signatory
Name:  Shane P. Maine

Authorised signatory (or witness)

Name of Witness:    Jackie Graham

Address:    60 Vermont Ave.

Toronto, ON

M6G 1X9

Occupation:    ...............................

Executed in a personal capacity by
Shane Maine

Signature of witness:    ...............................

Name of Witness:    Jackie Graham

Address:    60 Vermont Ave.

Toronto, ON

M6G 1X9

Occupation:    ...............................

5

Executed in the manner legally          )
binding on PSA INTERNATIONAL            )
INC.                                     )

..........................................
Authorised signatory
Name.  Shone P. Maire

..........................................
Authorised signatory (or witness)

Name of Witness:    Jackie Graham

Address:            60 Vermont Ave.

                    Toronto, ON

                    M6G 1X9

Occupation:         .................................


(The COMMON SEAL OF BTG
(INTERNATIONAL LIMITED was
(affixed to this Deed in the presence
(of

..........................................
Director/Authorised Signatory

..........................................
Director/Authorised Signatory

# EXHIBIT E

DATED 30ᵗʰ September                    1998


BTG INTERNATIONAL LIMITED


- and -


TECH-TRIANGLE PLASTIC WIRE INC.


L I C E N C E   A G R E E M E N T

## INDEX

| Clause | Heading | Page |
|---|---|---|
| 1 | Definitions | 1 |
| 2 | Consideration | 3 |
| 3 | Commencement and duration | 4 |
| 4 | Licences | 4 |
| 5 | Know-how | 5 |
| 6 | Royalties | 5 |
| 7 | Accounting | 6 |
| 8 | Payment, Currency and Taxes | 7 |
| 9 | Verification | 7 |
| 10 | Obligations of the Licensee | 8 |
| 11 | Exclusion of liability: Indemnity | 8 |
| 12 | Termination | 10 |
| 13 | Rights on termination | 11 |
| 14 | Improvements | 11 |
| 15 | Miscellaneous | 11 |
| 16 | Notices | 12 |
| 17 | Law and Jurisdiction | 12 |
| Schedule 1 | The Patents | 13 |
| Schedule 2 | The Know-how | 14 |
| Schedule 3 | Definitional Statutory Extracts | 15 |

THIS DEED is made the *Nineteenth* day of *September* 1998
BETWEEN

(1) BTG INTERNATIONAL LIMITED whose company registration number in England is 2664412 and whose registered office is at 10 Fleet Place, London, EC4M 7SB, England, ("BTG"), and

(2) TECH-TRIANGLE PLASTIC WIRE INC. whose company registration number in Canada is 254174-2-R and whose principal place of business is at 71 Sherwood Drive, Guelph, Ontario, Canada N1E 6E6 ("the Licensee").

IT IS AGREED THAT:-

1.    Definitions

IN this Agreement the following terms shall have the following meanings:-

"Accounting Date"

each of 31 August 1999, anniversaries thereof until the later to occur of (i) expiry of the last to expire of the Patents and (ii) 31 August 2007 (or earlier termination of this Agreement) and the date of such expiry or termination if not occurring on 31 August;

"Accounting Period"

each consecutive period ending on an Accounting Date;

"Caribbeans"

Anquilla   Antigua & Barbuda   Aruba
Bahamas   Barbados   Belize   Bermuda
Bonaire   Cayman Islands   Cozumel
Curaçao   Dominica   Dominican Republic
Grenada   Guadeloupe   Haiti   Jamaica
Margarita   Martinique   Montserrat
Puerto Rico   Saba   St Barthélmey
St Eustatius   St Kitts & Nevis
St Lucia   St Martin/Maarten   St Vincent
Turks & Caicos   Trinidad & Tobago
Virgin Is (US)   Virgin Is (British)

"Chargeable Transaction"

the use, sale, hiring or other disposal of a Product by or on behalf of the Licensee;

"Connected Persons"

the meaning ascribed by Section 839 of the Income and Corporation Taxes Act 1988, a relevant extract of which is set out in Schedule 3;

"Control"

the meaning derived from the provisions of Section 840 of the Income and Corporation Taxes Act 1988, a relevant extract of which is set out in Schedule 3;

"the Copyright"

the copyright and other rights in the nature of copyright subsisting in the Know-how or any of it;

1

"Deductions"

trade discounts and (where such items are specifically shown in the invoice) purchase, sales, import or Value Added taxes, any other taxes which may subsequently be introduced which BTG may agree should be treated as Deductions hereunder and the costs of packaging, packing, delivery and insurance, but not commission or cash discounts;

"the Design Right"

the registered and unregistered design right and other rights in the nature of design right subsisting in the Know-how or any of it;

"the Effective Date"

the date of this Agreement;

"The Index"

the General Index of Retail Prices (All Items) of the United Kingdom Central Statistical Office or if that Index shall cease to be published the nearest index having like effect;

"the IPR"

the Patents, the Copyright and the Design Right;

"the Know-how"

the technical information and data specified in Schedule 2 and any other information disclosed to the Licensee by BTG or the University in furtherance of this Agreement;

"the Licences"

the licences granted or to be granted under this Agreement;

"Licensee Improvement"

any improvement to or new application of the Licensed Technology devised by or accruing to the Licensee;

"Minimum Sum"

each of the sums specified in Clause 2.4;

"Net Selling Price"

the price of Products the subject of a Chargeable Transaction or held on expiry or termination as provided in Clause 7.4 calculated as follows:-

(i)     in the case of an arm's length sale or other disposal, the gross manufacturer's selling price F.O.B. manufacturing plant as charged or (if higher) the invoiced price, less any Deductions;

(ii)    in the case of use of a Product, or of Products held on expiry or termination in accordance with

2

Clause 7.4 or of a sale or other disposal which is not at an open market price, the open market price in the country where the use occurred, or the country of manufacture, or the country in which the sale or other disposal occurred (as the case may be), less any Deductions;

(iii) in the case of a leasing or hiring out, the leasing or hiring fees.

"the Patents"
(i) the patents and applications for patents specified in Schedule 1 and any patent which may be granted pursuant to any of such applications; and

(ii) any re-issues or extensions of such patents and any divisions and continuations of such applications.

"Product"
any rod made of polyolefin made, used, sold, hired out or otherwise disposed of, in any country by, or on behalf of, the Licensee and which

(i) falls within the scope of, or utilises any method or process or is made by means of or is subjected to any process which falls within the scope of, any of the Patents of that country; or

(ii) embodies or utilises or is made or used in accordance with any of the Know-how; or

(iii) but for this Agreement would infringe the Copyright; or

(iv) but for this Agreement would infringe the Design Right.

"Sub-licence"
a sub-licence or any agreement or commitment for the grant of a sub-licence;

"the University"
the University of Leeds.

2.    <u>Consideration</u>

THE Licensee shall pay to BTG:-

2.1    immediately upon the signing of this Agreement the sum of ten thousand pounds sterling (£10,000);

3

2.2    no later than the first anniversary of the Effective Date, the further sum of ten thousand pounds sterling (£10,000);

2.3    the royalties specified in Clause 6; and

2.4    at the end of each of the Accounting Periods specified below the amount, if any, by which the aggregate royalties payable under Clause 6 for the Accounting Period then ended fall short of the relevant Minimum Sum set alongside:-

| Accounting Period | Minimum Sum in Canadian Dollars |
|---|---|
| 1/9/1999 – 31/8/2000 | $3,700 |
| 1/9/2000 – 31/8/2001 and each subsequent Accounting Period | $8,000<br>(or in the event of expiry or termination prior to 31 August in any year, one twelfth of such sum for each calendar month for the whole or part of which this Agreement has subsisted since the previous Accounting Date) |

3.    **Commencement and duration**

3.1   THIS Agreement shall come into force on the Effective Date.

3.2   SUBJECT to Clauses 4.2, 12 and 13 the Licences in respect of the IPR shall continue in force in each country until all of the IPR of that country have expired.

3.3   THE Licensee shall be responsible for obtaining any requisite registration or governmental approval of this Agreement and shall expeditiously take all necessary steps to obtain it.

4.    **Licences**

4.1   BTG grants to the Licensee on and from the Effective Date:-

    4.1.1 non-exclusive licences under the Patents to make Products in the United States of America and to use, sell and otherwise dispose of Products in all countries of the world in which Patents from time to time exist;

    4.1.2 non-exclusive licences for the purpose of the manufacture of Products in Canada, the United States of America, Mexico and the Caribbeans and the registration, use, sale or disposal of Products anywhere in the world to use:-

        4.1.2.1    the Know-how;

        4.1.2.2    the Copyright; and

4

4.1.2.3    the Design Right.

4.2    THE Licences are granted for the purpose only of making, using, selling and otherwise disposing of Products as referred to in Clause 4.1 in accordance with and during the life of this Agreement.  If, immediately prior to the later to occur of (i) expiry of the last to expire of the Patents and (ii) 31 August 2007 the Licensee continues as the licensee hereunder in respect thereof, and provided that the Licensee is not then or subsequently in breach of any provision of this Agreement, the Licences granted under Clause 4.1.2 may continue on the terms hereof for the full period of the Copyright and the Design Right and indefinitely in the case of the Know-how, subject to the provisions of Clause 7.4 but otherwise free of charge.  None of the Know-how (or the IPR, whilst it subsists,) may be used, either before or after termination of this Agreement, for any purpose save as expressly authorised hereunder.

5.    Know-how

5.1    THE Know-how specified in Schedule 2 shall forthwith become subject to the terms of this Agreement.

5.2    THE Licensee shall keep the Know-how confidential to the Licensee, and to such of its officers and employees as are bound by obligations of confidence and need to be informed, and shall ensure that the Know-how is not disclosed to others orally or in writing, save to the extent that the Know-how:-

5.2.1 as evidenced by the Licensee's written records, was lawfully known to the Licensee prior to its communication by or through BTG and was not communicated to the Licensee subject to any restrictions on disclosure or use; or

5.2.2 is necessarily disclosed by the sale of Products embodying any of the Know-how; or

5.2.3 is or becomes in the public domain, otherwise than by any default of the Licensee, or persons acquiring it from the Licensee; or

5.2.4 becomes known to the Licensee by the action of a third party not in breach of any obligation of confidence.

6.    Royalties

6.1    THE Licensee shall pay to BTG:-

6.1.1 in respect of Products the subject of Chargeable Transactions occurring in the Accounting Periods ending on 31 August 1999 and 31 August 2000 and as provided in Clause 7.4 on Products held on the last Accounting Date (if occurring on or before 31 August 2000), a royalty at the rate of three and a half per cent (3.5%) on the Net Selling Price; and

6.1.2 in respect of Products the subject of Chargeable Transaction occurring after 31 August 2000 and as provided in Clause 7.4 on Products held on the last

5

Accounting Date (if occurring after 31 August 2000) at the following rates:—

| Products | Rate |
|---|---|
| for Products the subject of Chargeable Transactions (or held on expiry or termination) in each Accounting Period, in respect of which the aggregate Net Selling Price in that Accounting Period does not exceed two million three hundred thousand Canadian dollars (Can $2,300,0000) | five per cent (5%) of the Net Selling Price |
| for Products the subject of Chargeable Transactions (or held on expiry or termination) in each Accounting Period, in respect of which and to the extent that the aggregate Net Selling Price in that Accounting Period exceeds two million three hundred thousand Canadian dollars (Can $2,300,000) | four and a half per cent (4.5%) of the Net Selling Price |

6.2    IF a Product is incorporated in any other product, equipment, or apparatus, manufactured or sold by or on behalf of the Licensee or the Licensee such Product shall be accounted for separately under this Agreement at the price which would have been charged had the Product been sold separately on the open market Provided always that use of a Product as or incorporation of a Product into a drumstick shall bear royalty on the price of the drumstick.

6.3    ROYALTY shall only be payable once in respect of the same Product.

6.4    THE Licensee shall at the request of BTG provide half-yearly forecasts of the amount of royalties likely to be payable under this Agreement.

7.    Accounting

7.1    THE Licensee shall keep true and detailed accounts and records of all royalties and other sums due under this Agreement.

7.2    THE Licensee shall:-

7.2.1 within thirty days after each Accounting Date deliver to BTG a statement of all royalties and other sums due for the Accounting Period ended on that Accounting Date showing separately the Chargeable Transactions in each country, and (in the case of the last Accounting Date) the calculation of the relevant Net Selling Price of Products held on the last Accounting Date as referred to at Clause 7.4 and (where relevant), the rate of exchange used or, if it be the case, a statement that no royalties are due; and

7.2.2 send with such statement the amount shown to be due.

7.3    THE Licensee shall immediately and without demand send to BTG the difference between an amount already paid and the correct amount shown to be due and payable as a result of verification under Clause 9.

6

**7.4**   ON the last Accounting Date, the final statement shall include details of royalties on all Products in course of manufacture and all Products manufactured but not yet disposed of at the last Accounting Date.   The Licensee shall pay royalty to BTG in respect of all such Products as if they were the subject of a sale at the last Accounting Date and shall then be free to use, sell or dispose of such Products in respect of which royalty has been paid.

**8.**   Payment, Currency and Taxes

**8.1**   NO payments made under this Agreement shall be refundable in any circumstances.

**8.2**   WHEN making any payment under this Agreement the Licensee shall also pay any Value Added Tax payable.

**8.3**   ALL payments shall be made to BTG's account no. 48292427 at National Westminster Bank plc, PO Box 3038, 57 Victoria Street branch, London SW1H 0HN, England (sort code 56-00-33) whether in Sterling or Canadian dollars or as otherwise directed by BTG.   Any necessary currency conversion shall be at the rate quoted by the Royal Bank of Canada for such conversion on the last business day of the relevant Accounting Period.

**8.4**   IF the Licensee fails to make full payment of the royalties and other sums on the due date the amount due shall bear interest, accruing from the due date until the date of actual payment, whether before or after judgement calculated at a daily rate equivalent to Four per cent (4%) above the Base Rate for the time being of the Royal Bank of Canada and compounded annually on 31 December in each year.

**8.5**   ANY overpayment of royalty demonstrated to the satisfaction of BTG to have been made by the Licensee may be off set against future payments due by the Licensee to BTG hereunder Provided it is brought to the attention of BTG no later than the end of the Accounting Period immediately following the Accounting Period in which such overpayment was made.   Otherwise payments shall be made without set-off or deduction, other than such amount as the Licensee is required to deduct or withhold by law.   In regard to any such deduction, the Licensee shall use all reasonable endeavours to assist BTG to claim recovery or exemption under any double taxation or similar agreement. Evidence as to the payment of such tax or sum withheld shall, on request, be given by the Licensee to BTG.

**9.**   Verification

THE Licensee shall permit any authorised representative appointed by BTG, upon reasonable notice, access to the premises of the Licensee and access to the accounts, records and relevant documentation of the Licensee and shall provide such information and explanations as the representative shall require to verify the statements and to satisfy BTG that the provisions of this Agreement are being complied with.   The representative shall also be permitted to take copies and extracts.   If the verification discloses an underpayment to BTG of more than 5% of the amount due, the Licensee shall promptly on demand reimburse BTG the fees and costs of the representative, and the reasonable costs incurred by BTG in respect of the verification.

## 10.    Obligations of the Licensee

10.1  THE Licensee shall use all reasonable endeavours to promote the distribution and sale of Product.

10.2  THE Licensee shall legibly mark the Products or, if not practicable, then any associated packaging or literature, with:-

    10.2.1    the relevant patent or application number;

    10.2.2    the Universal Copyright Convention copyright symbol or any other symbol or words required or allowed under the laws of any country to indicate ownership of Copyright or Design Right; and

    10.2.3    such details as are necessary for disapplying or avoiding infringement of any moral rights applying to any relevant material the subject of this Agreement.

10.3  THE Licensee shall procure that:-

    10.3.1    in the exercise of rights under this Agreement all activities by or on behalf of the Licensee shall comply with all statutory, governmental and regulatory obligations(including without limitation those relating to export and import) in all relevant countries; and

    10.3.2    all steps are taken expeditiously to obtain requisite consents and approvals necessary to comply with Clause 10.3.1; and

    10.3.3    if so requested, there are provided to BTG without delay, copies of all such consents and approvals together with such further information as BTG shall reasonably require.

## 11.    Exclusion of liability; Indemnity

11.1  NO representation condition or warranty whatsoever is made or given by or on behalf of BTG.  All conditions and warranties, whether arising by operation of law or otherwise, to the effect that:-

    11.1.1    any of the IPR is valid or enforceable, or

    11.1.2    any of the acts hereby licensed or agreed to be licensed by BTG will not infringe the rights of third parties

are hereby expressly excluded.

11.2  WITHOUT prejudice to the generality of the foregoing, no representation, condition or warranty whatsoever is made or given by or on behalf of BTG in respect of any of the Know-how and all conditions and warranties, whether arising by operation of law or otherwise, in relation to the provision or use of the Know-how are hereby expressly excluded.

8

11.3  BTG shall be under no liability whatsoever to the Licensee (whether in negligence or otherwise, in contract or in tort) for any expense, loss, death, damage or injury of any kind (including any loss of profit or consequential damage) sustained by the Licensee or any third party (except if caused as a direct result of BTG's wilful misconduct) which:-

11.3.1    arises or is incurred in connection with the development, manufacture, use, storage or disposal of Products; or

11.3.2    arises or derives directly or indirectly from the use of the IPR; or

11.3.3    arises or derives directly or indirectly from the provision, evaluation or use of the Know-how; or

11.3.4    arises or derives directly or indirectly from any technical or other advice given by BTG or any of its officers, employees or agents to the Licensee or from any reliance by the Licensee or any third party thereon.

11.4  THE Licensee shall indemnify BTG from and against all claims, demands, actions, liabilities and damages made by, or awarded to, any person and any costs and expenses thereof (including legal fees) (except those caused as a direct result of BTG's wilful misconduct) which:-

11.4.1    arise or are incurred in connection with the development, manufacture, use, storage, sale or disposal of Products; or

11.4.2    arise or derive directly or indirectly from the use of the IPR hereunder; or

11.4.3    arise or derive directly or indirectly from the provision, evaluation or use of the Know-how hereunder; or

11.4.4    arise or derive directly or indirectly from any technical or other advice given by BTG or any of its officers, employees or agents to the Licensee or from any reliance by the Licensee or any third party thereon.

11.5  DURING the currency of this Agreement and for two (2) years thereafter the Licensee shall, at its own cost, effect and maintain in force with reputable insurers adequate insurance in respect of Products and their manufacture, use and supply and shall provide evidence of such insurance to BTG on request.

11.6  ANY insurance policy effected and maintained pursuant to Clause 11.5 shall:-

11.6.1    name BTG as additional insured; and

11.6.2    waive any right of subrogation of the insurers against BTG; and

11.6.3    be primary and without right of contribution from other insurance which may be available to BTG; and

11.6.4    prohibit any alteration adversely affecting BTG's interest in the insurance (or any alteration inconsistent with the requirements of Clause 11); and

11.6.5    prohibit the lapse of or any cancellation or non-renewal of such insurance, without the prior consent in writing of BTG.

## 12.    Termination

12.1   THE Licensee may, at any time, terminate this Agreement or any of the Licences, on any Accounting Date by giving not less than three months' notice to that effect.

12.2   BTG may terminate this Agreement, or any of the Licences forthwith, by notice to the Licensee, upon the happening of any of the following events:-

12.2.1    if any royalties or other sums payable remain unpaid for thirty days after the due date; or

12.2.2    if the Licensee is in breach of any of the other terms or obligations of this Agreement, and such breach is not capable of remedy;

12.2.3    if the Licensee has a Receiver or an Administrative Receiver or Administrator appointed of the whole, or any part, of its undertaking or assets, or has an officer appointed to perform a function analogous to that of any such officer;

12.2.4    if an order is made, or a resolution passed, for winding-up or administering the Licensee, unless such order or resolution is part of a scheme of solvent reconstruction of the Licensee;

12.2.5    if Control of the Licensee shall be acquired by any person, or group of Connected Persons, not having Control of the Licensee at the date of this Agreement;

12.2.6    if the Licensee is in breach of any of its obligations relating to insurance as set out in Clauses 11.5 or 11.6.

12.3   IF the Licensee is in breach of any of the terms or obligations of this Agreement, other than the cases referred to in Clause 12.2, and such breach is capable of remedy, BTG may serve on the Licensee a notice of termination of the Agreement or any of the Licences and that notice shall have automatic effect forty-five days after the date of service, unless within that period the Licensee shall have remedied the breach.

10

13.    <u>Rights on termination</u>

13.1    TERMINATION of this Agreement, or of any of the Licences, shall be without prejudice to any rights of either party against the other which may have accrued up to the date of termination.

13.2    TERMINATION of this Agreement for any reason shall not bring to an end:-

13.2.1    the confidentiality obligations of Clause 5;

13.2.2    the obligations of the Licensee in respect of the accounting for, payment of and verification of royalties under Clauses 6, 7, 8 and 9 until the settlement of all claims of BTG;

13.2.3    the provisions of Clauses 10.2, 11 and 13.

14.    <u>Improvements</u>

14.1    THE Licensee shall ensure that BTG is promptly informed of all Licensee Improvements and of its decision whether to make patent applications in respect thereof.

14.2    LICENSEE Improvements may not be used or disclosed by the Licensee during the period of this Agreement or at any time thereafter if such use or disclosure would necessitate or result in any unauthorised use of the Patents or any other intellectual property rights of BTG or breach of the obligations set out in Clause 5.2.

14.3    THE Licensee shall (if requested) grant BTG an unrestricted worldwide licence with full right to sub-license in respect of all Licensee Improvements, subject to the provisions of this sub-clause:-

14.3.1    such licence shall be non-exclusive and subject to the provisions of BTG's then current Revenue Sharing Agreement.

14.3.2    BTG shall on request of the Licensee grant to the Licensee a non-exclusive licence on the terms of this Agreement of any of its own improvements to the Know-how specified in Schedule 2 or the Patents.

15.    <u>Miscellaneous</u>

15.1    BTG shall, at the request and expense of the Licensee, execute any further formal document which may be necessary to give effect to this Agreement in any country.

15.2    THE Minimum Sums and the sum of Can $2,300,000 referred to at Clause 6.1 shall be increased in proportion to the increase (if any) in the Index between the Effective Date and the Index published immediately prior to expiry of the Accounting Period in respect of which payments are due to be made hereunder.

15.3    THIS Agreement constitutes the entire agreement between the parties relative to the subject matter hereof and no additions or modifications to this Agreement shall be effective unless in writing and executed by both parties.

15.4  THE Licensee shall not grant any Sub-licence hereunder, nor without the previous consent of BTG assign, charge or otherwise dispose of any of its rights or obligations under this Agreement, or any of the Licences.

15.5  THE failure by either party to exercise or enforce any rights under this Agreement shall not be deemed to be a waiver of any such rights, nor shall any single or partial exercise of any right, power, or privilege, or further exercise thereof, operate so as to bar the exercise or enforcement thereof at any later time.

15.6  THE waiver by either party of any breach of any of the terms of this Agreement by the other shall not be deemed to be a waiver of any other breach of the Agreement.

15.7  IF any part or provision of this Agreement is prohibited by or is found to contravene or is rendered void or unenforceable by any regulation or legislation, the validity or enforceability of any other part of this Agreement shall not be affected, provided that this Agreement can reasonably be expected to be performed by the parties without reference to that prohibited, void or unenforceable part or provision.

15.8  SAVE as provided in Clause 12, the rights and remedies provided in this Agreement are additional to any rights or remedies provided by law or in equity.

15.9  NEITHER party shall make or authorise any public statement or press release of the terms hereof without the prior approval of the other party, which shall not be unreasonably delayed or withheld.

16.  Notices

16.1  ANY notice authorised or required to be given by either party under this Agreement to the other party, shall be in writing, and shall be deemed to be duly given if left at, or sent by [recorded delivery or] registered post (airmail if overseas) addressed to:-

    16.1.1     in the case of BTG, its registered office, and

    16.1.2     in the case of the Licensee, its registered office or the address of the Licensee at the head of this Agreement, unless notice of change has been given to BTG in writing.

16.2  ANY notice, if sent by post, shall be deemed to have been served at the expiration of ten days after posting.

17.  Law and Jurisdiction

17.1  THIS Agreement is to be construed in accordance with, and governed by, English law.

17.2  THE Licensee submits to the non-exclusive jurisdiction of the English Courts.

    I N   W I T N E S S   whereof this document has been executed as a Deed the day and year first above written.

12

## SCHEDULE 1

### The Patents

| BTG TITLE | COUNTRY | APPLICATION NUMBER | APPLICATION DATE | PATENT NUMBER | PATENT DATE | ANTICIPATED EXPIRY DATE |
|---|---|---|---|---|---|---|
| DIE DRAWING | UNITED KINGDOM | | | 2060469 | 28 SEP 83 | 06 JUN 00 |
| | AUSTRIA | | | EP0038798 | 12 SEP 84 | 05 JUN 00 |
| | FRANCE | | | EP0038798 | 12 SEP 84 | 05 JUN 00 |
| | GERMANY | | | EP0038798 | 12 SEP 84 | 05 JUN 00 |
| | JAPAN | | | 1565652 | 25 JUN 90 | 06 JUN 00 |
| | NETHERLANDS | | | EP0038798 | 12 SEP 84 | 05 JUN 00 |
| | SWEDEN | | | EP0038798 | 12 SEP 84 | 05 JUN 00 |
| | SWITZERLAND | | | EP0038798 | 12 SEP 84 | 05 JUN 00 |
| PRESSURE EXTRUSION PRESSURE PRESSURE | UNITED KINGDOM | | | 2152298 | 18 NOV 87 | 11 APR 05 |
| | FRANCE | | | EP0161802 | 27 JUN 90 | 10 APR 05 |
| | GERMANY | | | EP0161802 | 27 JUN 90 | 10 APR 05 |
| | JAPAN | | | 1935756 | 26 MAY 96 | 10 APR 05 |
| | NETHERLANDS | | | EP0161802 | 27 JUN 90 | 12 APR 05 |
| | USA | | | 4938913 | 03 JUL 90 | 10 APR 05 |
| PRESSURE TO PRESSURE EXTRUSION (2) | UNITED KINGDOM | 222995 | 21 JUL 88 | 2207436 | 24 JUL 91 | 24 JUL 07 |
| | USA | | | 5096654 | 17 MAR 92 | 17 MAR 09 |
| | USA | | | | | |

13

<u>SCHEDULE 2</u>

<u>The Know-how</u>

A paper entitled "Technical Information for Die-Drawing Project".

14

## SCHEDULE 3

### Definitional Statutory Extracts

#### Extracts from Income and Corporation Taxes Act 1988 relevant to defined terms "Connected Persons" and "Control"

Connected Persons"

s839  (5)   A company is connected with another company –

(a)   if the same person has control of both, or a person has control of one and persons connected with him, or he and persons connected with him, have control of the other; or

(b)   if a group of two or more persons has control of each company, and the groups either consist of the same persons or could be regarded as consisting of the same persons by treating (in one or more cases) a member of either group as replaced by a person with whom he is connected.

(6)   A Company is connected with another person if that person has control of it or if that person and persons connected with him together have control of it.

(7)   Any two or more persons acting together to secure or exercise control of a company shall be treated in relation to that company as connected with one another and with any person acting on the direction of any of them to secure or exercise control of the company.

(8)   In this section–

"company"   includes   any   body   corporate   or unincorporated association;

Control"

s840. "control", in relation to a body corporate, means the power of a person to secure–

(a)   by means of the holding of shares or the possession of voting power in or in relation to that or any other body corporate; or

(b)   by virtue of any powers conferred by the articles of association or other document regulating that or any other body corporate,

that the affairs of the first-mentioned body corporate are conducted in accordance with the wishes of that person.

15



(The COMMON SEAL of  BTG
(INTERNATIONAL LIMITED was
(affixed to this Deed in the
(presence of:-

Director/Authorised Signatory

Secretary/Authorised Signatory

Executed in the manner legally    )
binding on TECH-TRIANGLE          )
PLASTIC WIRE INC. by              )
[...FRANK MAINE........]          )

.............................
PRESIDENT
.............................
Titles of signatories

16



(The COMMON SEAL of   BTG
(INTERNATIONAL LIMITED was
(affixed to this Deed in the
(presence of:-

_____
Director/Authorised Signatory

_____
Secretary/Authorised Signatory

Executed in the manner legally    )
binding on TECH-TRIANGLE          )
PLASTIC WIRE INC. by              )
                                  )
[... FRANK MAINE .........]        )

.......................................

PRESIDENT
.......................................
Titles of signatories

16

STERLING DRAFT — PURCHASER'S RECEIPT

01782-003

**ROYAL BANK OF CANADA**

74 Wyndham Street North,
GUELPH, ONT. N1H 4E4

ISSUING BRANCH

463019  00463019
1998 Oct 13

DATE

PAY TO THE
ORDER OF  **BTG INTERNATIONAL LTD.**

£ ***10,000.00

TEN THOUSAND***************** XX/100

RE
TO  TECH-TRIANGLE PLASTIC WIRE INC.

**ROYAL BANK OF CANADA**
71/71A QUEEN VICTORIA STREET
LONDON, EC4V 4DE

NOT EXCEEDING



PREPARED BY   VERIFIED BY

RATE
EQUIV.
CHARGES
TOTAL

FORM 6390 (03-1998) RETAINS 6 YEARS

NAME OR
SIGNATURE OF
PURCHASER



THANK YOU!  MERCI!

Foreign Exchange Service

Service de Change

# EXHIBIT F

## SATISFACTION OF LICENSING OBLIGATIONS AND RELEASE OF GUARANTORS

Agreement made this _____ day of March, 2005 between PSA Composites, LLC, PSA Composites, Inc. and PSA International, Inc. (collectively as required below "PSA") and BTG International, Ltd. ("BTG").

## RECITALS



(a.) BTG, is the authorized licensor of certain patented die drawing processes to Tech-Triangle Plastic Wire, Inc. (as predecessor to SHW Technologies, Inc., hereafter "SWH") as reflected in that certain licensing agreement entered into by the parties on September 30, 1998 (the "DD license") and;

(b.) WHEREAS, PSA Composites, Inc. ("PSAC"), PSA International, Inc. ("PSAI") and BTG have entered into a Termination Agreement (the "TA") so that PSAC, and its principals may devote increased effort to development of an unrelated patented extrusion process with PSA Composites, LLC (a Washington company) and;

(c.) WHEREAS, PSA Composites, LLC is willing to secure the release of itself: (1.) SWH and (2.) Shane Maine, (3.) PSAC and (4.) PSAI and their predecessors, successors and heirs as licensee's and/or guarantors under the TA through payment of all remaining amounts due BTG pursuant to the DD License and;

(d.) WHEREAS, PSA Composites, LLC on behalf of PSAC and PSAI tenders herewith the final installment due under the TA of £100,000 and the parties desire to acknowledge satisfaction and release of all obligations related to the DD license and the TA and to confirm release of certain guarantors;

## TERMS

NOW THEREFORE IT IS AGREED, in consideration of PSA Composites, LLC's early payment and other valuable consideration that:

1.    All obligations of SHW under the DD license are hereby satisfied and BTG agrees, pursuant to the terms of the TA and by estoppel hereunder, that SHW, PSAC, PSAI and PSA Composites, LLC, their officers, employees, agents, investors and any successors and predecessors thereof and in the case of Shane Maine his heirs, administrators, associates, successors or assigns, are hereby released from any guaranty, claim or demand related to any royalties owed BTG.

2.    All obligations of PSA Composites, LLC and predecessor companies including PSAC, PSAI, SHW and Shane Maine, his heirs, administrators, associates, successors or assigns arising under the TA, including that certain guaranty set out in paragraph 4 of the TA are hereby cancelled and



1 – SATISFACTION OF LICENSING
    OBLIGATIONS AND RELEASE OF GUARANTORS

pursuant to the terms of the TA and estoppel hereunder, PSA Composites, LLC, PSAC, PSAI, Shane Maine his heirs, administrators, associates, successors or assigns, are hereby released from any guaranty, claim or demand related to any royalties owed BTG.

3.    BTG hereby agrees that PSA Composites, LLC shall be treated as an intended beneficiary of the TA and shall, pursuant to the terms of the TA (including but not limited to paragraph 5 and 7) and estoppel hereunder be released from any guaranty, claim or demand related to any royalties or other payments owed BTG.

## <u>EXECUTION IN COUNTERPARTS</u>

This agreement may be executed by several counterparts in the same form and such counterparts as so executed shall together form one original agreement, and such counterparts, if more than one, shall be read together and construed as if all signing parties hereto had executed one copy of this agreement.

This agreement has been executed as a Deed the day and year first above written by authorized representatives of the parties.

Executed in the manner legally              )
binding on PSA Composites, LLC          )

_____
Authorized signatory
Name: Ken T Kortenbael

Executed in the manner legally
binding on BTG International Limited
through affixing its common seal in the
presence of

_____
Director/Authorized signatory
Name: K. DOVELL

_____
Director/Authorized signatory
Name: R. DAVISON

2 – SATISFACTION OF LICENSING
     OBLIGATIONS AND RELEASE OF GUARANTORS

JS 44   (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

WEYERHAEUSER COMPANY

**DEFENDANTS**

DOW CHEMICAL COMPANY, UNIVERSITY OF LEEDS, BTG INTERNATIONAL LTD., and IAN M. WARD

(b)  County of Residence of First Listed Plaintiff _____*_____

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed _____

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

* Plaintiff is a Washington corporation

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Steven J. Balick (ID #2114)
Ashby & Geddes
500 Delaware Avenue, 8th Floor, P.O. Box 1150
Wilmington, DE  19899   (302) 654-1888

Attorneys (If Known)

unknown

## II. BASIS OF JURISDICTION     (Place an "X" in One Box Only)

☐ 1  U.S. Government
     Plaintiff

☒ 3  Federal Question
     (U.S. Government Not a Party)

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     (Indicate Citizenship of Parties
     in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                      and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT     (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | | | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | ☐ 871 IRS—Third Party | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | 26 USC 7609 | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN     (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  Original
     Proceeding

☐ 2  Removed from
     State Court

☐ 3  Remanded from
     Appellate Court

☐ 4  Reinstated or
     Reopened

Transferred from
another district
☐ 5  (specify)

☐ 6  Multidistrict
     Litigation

Appeal to
District
Judge from
☐ 7  Magistrate
     Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

Title 35, U.S. Code, this is an action arising under the patent laws of the United States.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
   UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See
instructions):

JUDGE _____

DOCKET NUMBER _____

DATE

June 21, 2007

SIGNATURE OF ATTORNEY OF RECORD

_[signature]_

FOR OFFICE USE ONLY

RECEIPT # _____     AMOUNT _____     APPLYING IFP _____     JUDGE _____     MAG. JUDGE _____

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.     (a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b.) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.     Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.     Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.     Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.     Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.     Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.     Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.     Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 7 - 3 9 5

# ACKNOWLEDGMENT
## OF RECEIPT FOR AO FORM 85

### *NOTICE OF AVAILABILITY OF A*
### *UNITED STATES MAGISTRATE JUDGE*
### *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 4 _____ COPIES OF AO FORM 85.

| JUN 2 1 2007 | Mike Bobish |
|---|---|
| (Date forms issued) | (Signature of Party or their Representative) |

Mike Bobish

(Printed name of Party or their Representative)

**Note: Completed receipt will be filed in the Civil Action**